ALLEN et al. v. FIELD.

(Circuit Court of Appeals, Second Circuit. April 21, 1904.)

No. 109.

1. CONTRACTS—ACTION FOR BREACH—EFFECT OF ASSIGNMENT.

Defendants contracted for the purchase of the greater part of the product of plaintiff's distillery for 15 seasons, to be delivered in bond at a stipulated price per gallon. The practical construction placed upon the contract by both parties was that it was not assignable by either party without the consent of the other. Defendants having made an assignment, plaintiff refused to accept the assignee as a substitute, except with the understanding that defendants would still be bound, while defendants insisted on such acceptance. Plaintiff subsequently agreed to, and did, deliver to the assignee, as requested by defendants, but with a statement to them that he did not waive his right to hold them if the assignee should make default. The contract was treated as in force by both parties for several months thereafter, and until both the assignee and defendants refused to accept further deliveries or to pay therefor. *Held,* on the evidence, that there had been no breach by plaintiff which justified such refusal, and that plaintiff was entitled to recover damages from defendants for their breach.

2. SAME—BREACH—MEASURE OF DAMAGES.

On the repudiation of such contract by defendants without legal right, after it had been in effect for one or two seasons, plaintiff was not bound to continue to operate his distillery during the remainder of the term and to market the product, for the purpose, if possible, of reducing the damages resulting to him from defendants' breach, but was entitled to sue for the breach at once, the measure of his damages being the difference between the contract price and the cost of manufacture.

3. SAME—EVIDENCE OF COST OF PERFORMANCE.

Evidence of the average cost of manufacturing and the average price of the grain used during a series of years was competent as furnishing a basis on which the jury might estimate the probable cost during the remainder of the term.

4. SAME—CONSTRUCTION—DAMAGES RECOVERABLE FOR BREACH.

A contract by which plaintiff agreed to manufacture for defendants, and defendants to buy, stated quantities of whiskey, not less than 3,000 barrels each season, for a term of 15 years, at a stipulated price per gallon, provided that, if the price of corn in the Chicago market should be more than 45 cents per bushel on the first Tuesday in October in any year, plaintiff should not be obligated to manufacture during that season, but that, if he should manufacture to exceed 500 barrels, defendants should have the right, at their option, to demand the usual quantity and up to 5,000 barrels at the agreed price. *Held,* that such provision did not render the contract unilateral, but was one for the mutual protection of the parties in a contingency which might arise, and the fact that it became operative in one season, after defendants had refused to further perform, did not affect plaintiff's right to recover damages on account of the breach for subsequent seasons, and that the effect of such provision on the amount of damages which would result to plaintiff from the breach during the remainder of the term was properly left to the determination of the jury.

5. SAME—DAMAGES RECOVERABLE FOR BREACH—SALE OF PRODUCT TO BE MANUFACTURED.

Where plaintiff, who was the owner of a distillery, on the refusal of defendants to further perform a contract by which they agreed to take and pay for the entire product of his distillery for a term of years, except-

¶ 5. Contracts for sale of things to be produced or manufactured, see note to Star Brewery Co. v. Horst, 58 C. C. A. 363.

ing a certain number of barrels each year, brought suit for breach of the contract, to recover as damages the profit he would have made during the remainder of the term, defendants were entitled to show that plaintiff continued to operate his distillery after the breach, and the profits he actually made thereby up to the time of trial, and to have the same set off against his estimated profits under the contract.

6. SAME—EXPERT TESTIMONY.

In such case defendants were also entitled to a reasonable deduction for the less time engaged and the release from the trouble, risk, and responsibility attending the full execution of the contract, and upon the question as to the amount of such deduction the testimony of experts familiar with the business in the locality where plaintiffs' distillery was situated was admissible, if properly limited to the particular matters as to which the witnesses had experience.

7. SAME.

The contract containing a provision that the whiskey was to be delivered to defendants in plaintiff's warehouse, and that storage should be paid thereon at a stipulated price per month until it was withdrawn, and it being shown that whiskey was customarily left in the warehouse for some years, and that there was a profit in its storage, plaintiff was entitled to recover damages on account of the loss of storage, which was an item presumably taken into consideration by the parties when the contract was made.

In Error to the Circuit Court of the United States for the Southern District of New York.

This cause is brought here by writ of error from a judgment of the United States Circuit Court for the Southern District of New York, entered upon a verdict by the jury in favor of plaintiff for $50,000 damages for breach of contract. The plaintiff in the court below has died since the commencement of the action, and his estate is represented on this appeal by his executors.

Levy Mayer, for plaintiffs in error.

William Lindsay, for defendant in error.

Before LACOMBE, TOWNSEND, and COXE, Circuit Judges.

TOWNSEND, Circuit Judge. Prior to the commencement of this action, plaintiff was a distiller of whiskey in Kentucky. The defendants are wholesale dealers in whiskey at New York. The negotiations between the parties herein appear from the record to have been opened by a letter from defendants to plaintiff, stating that, as they had sold their Louisville distilleries to the Kentucky Distilleries & Warehouse Company, and must have goods to substitute for those whiskeys, which they no longer handled, if they could make some arrangement with him to control the output of his house, under an arrangement extending over a term of years, and providing for the restriction of the production within what they would consider proper limits, and at a price which would make it an object for them to go into such a transaction, the matter might be considered. On April 12, 1899, the parties entered into a written contract whereby plaintiff undertook to manufacture and deliver to defendants certain quantities of whiskey, under certain conditions, for 15 distilling seasons. The material portions of said 'agreement are as follows:

"First: * * * This agreement, and all of its parts and provisions, shall run in favor of and be obligatory upon each of the parties hereto and their respective successors, legal representatives and assigns.

"Second: The term 'distilling season,' as hereinafter used, shall be held to mean the period of time between October 1st of one year and June 1st of the following year, and this contract shall continue to be in full force and effect for and during a period of fifteen (15) distilling seasons, the first of said fifteen (15) distilling seasons beginning on or after October 1st, 1899.

"Third: The second party [plaintiff] hereby agrees to manufacture for and sell and deliver to the first party [defendants], and the first party hereby agrees to purchase from the second party three thousand (3,000) barrels of whiskey during each of said five (5) consecutive distilling seasons, the first of said seasons to begin on or after October 1st, 1899, but the first party shall have and is hereby given the exclusive right and option to purchase from the second party, and in that event the second party shall manufacture and sell and deliver to the first party not to exceed five thousand (5,000) barrels of whiskey during one or more of said five (5) distilling seasons.

"Fourth: The second party hereby agrees to manufacture for and sell and deliver to the first party, and the first party hereby agrees to purchase from the second party three thousand five hundred (3,500) barrels of whiskey during each of the remaining ten (10) distilling seasons, the first of said seasons to begin on or after October 1st, 1904, but the first party shall have and is hereby given the exclusive right and option to purchase from the second party, and in that event the second party shall manufacture and sell and deliver to the first party not to exceed five thousand (5,000) barrels of whiskey during any one or more of said remaining ten (10) distilling seasons.

"Fifth: The price at which during each and all of said distilling seasons the second party hereby agrees to manufacture, sell and deliver and the first party hereby agrees to purchase said whiskey shall be and is hereby fixed at Thirty (30) cents per proof gallon in bond, original gauges, provided the bona fide market price of cash corn be not more than forty-five cents per bushel, Chicago Board of Trade, on the first Tuesday in October, in such respective distilling seasons. If, on the other hand, said market price is, on the date and place aforesaid, in any such respective distilling seasons, more than forty-five (45) cents per bushel, the second party shall not be obligated to manufacture, sell and deliver to the first party hereunder any whiskey during such distilling season, but if the second party shall, during such distilling season, manufacture whiskey in excess of five hundred (500) barrels, then the second party shall be obligated to manufacture, sell and deliver to the first party during such distilling season at the price of thirty (30) cents per proof gallon the aforesaid respective amount of whiskey during such distilling season, up to five thousand (5,000) barrels of whiskey at the option of the first party as aforesaid. Said whiskey shall be paid for upon the delivery of warehouse receipts, on or after the first day of the month, succeeding the month of its entry into bond.

"Sixth: During any of said distilling seasons the second party shall have the right to manufacture for the use of the second party not to exceed five hundred (500) barrels of whiskey during any of said distilling seasons in excess of the respective quantities hereinbefore specified, and if the second party shall manufacture more than five hundred (500) barrels of whiskey during any of said distilling seasons in excess of the respective quantities hereinbefore specified, then and in that event, for every barrel of whiskey so manufactured in excess by the second party, the second party shall and hereby agrees to pay the first party Five Dollars ($5). It is expressly understood and agreed, however, that no part or parcel of said five hundred (500) barrels of whiskey which the second party is hereby permitted to manufacture for his own use during any of said distilling seasons shall be directly or indirectly sold or disposed of by the second party to any distillery or wholesale liquor dealer in the United States. * * *

"Ninth: The second party further agrees that for all the whiskeys agreed by him to be manufactured for and sold to the first party hereunder, the second party will issue to the first party the second party's usual and regular warehouse receipts in five (5) barrel certificates, * * * and that the rate of

storage for said whiskey shall be five (5) cents per barrel per month, from the date of the warehouse receipts. * * *

"Eleventh: It is further expressly understood and agreed that for the purpose of enabling the first party to ascertain and determine whether the second party has complied with the terms and conditions hereof, the first party shall have and is hereby given the right and privilege at any time to examine and inspect any and all of the internal revenue books which are or shall be kept by the second party in the operation of the second party's distillery.

"Twelfth: It is further expressly understood and agreed that all of the whiskey which the second party has hereby agreed to manufacture for and sell to the first party shall be manufactured by the second party in the distillery plant now owned by the second party and known as J. W. M. Field Distillery, near Owensboro, Daviess County, Kentucky, or in such other distillery as in case of fire or accident may by the second party be erected or constructed or procured in lieu of it as a substitute for the distillery plant so as aforesaid now owned by the second party. * * *

"It is expressly understood and agreed that during the term of this contract, the second party shall not and will not, directly or indirectly, manufacture or sell or deliver any whiskey except as hereinbefore otherwise provided, except that he may sell as much whiskey, of the manufacture of others, as he sees proper."

The defendants, in making this agreement, were acting on behalf of the Kentucky Distilleries & Warehouse Company, known as the "Whiskey Trust," but this fact was not communicated to the plaintiff. The circumstances leading up to the rescission of the contract and the controversies in relation thereto appear from the correspondence between the parties. Shortly after the execution of the agreement, plaintiff wrote defendants, stating that he purposed to incorporate his distillery, and that he would like to convey said contract to the new corporation, stating that it would be essential, of course, that the defendants should consent to the transfer. The defendants assented to said arrangement, and a proposed agreement was forwarded by plaintiff to defendants, which provided that the defendants should carry out the contract with the new corporation, and that the plaintiff should be bound to the fulfillment of said contract by said corporation. Upon receipt of said contract the defendants replied as follows:

"October 28, 1899.

"Field: Our counsel will draw a contract embodying the assent to your transfer to the company. In such contract we will also specify 'that the assent is given by the Kentucky Distilleries & Warehouse Company, to whom the contract of April 12, 1899, above referred to has heretofore been assigned by Paris, Allen & Co.'"

And plaintiff's reply was as follows:

"Would suggest that P., A. & Co. guarantee the faithful performance of Kentucky Company obligations, same as I guarantee for J. W. M. Field, Incorporated."

Shortly afterwards the Kentucky Company forwarded to plaintiff a contract signed by it, which provided that the plaintiff should be bound for the performance of the contract by the Field corporation, but made no provision that the defendants should guaranty the fulfillment of the contract by the Kentucky Company. Plaintiff demurred to this, and on November 20, 1899, wrote that, so long as the defendants had gotten out of the contract, he expected them to guaranty the fulfillment of the contract by the Kentucky Company. To this letter defendants made no reply. On December 2, 1899, the Kentucky Company wrote to plain-

tiff requesting him, as it had assumed the contract between him and defendants, to invoice the whiskey to said company, and make drafts on it for amounts due, and attach drafts in accordance with the original contract. The plaintiff made no reply to this letter, and sent the whiskey and drafts to the defendants. Defendants objected to this course, and requested plaintiff thereafter to make drafts to the company, as the contracts had been turned over to it, and it had assumed the same. On December 28, 1899, the plaintiff wrote the following letter:

"Your favor of the 14th inst. received. As my contract is with you, I do not want to have any dealings in connection with the Kentucky Distilleries & Warehouse Co., but if you direct me I will make drafts on that company as suggested in your letter, on condition that by doing so I am not to be considered as in any way releasing you from the contract between you and me, and am willing to make drafts on that company instead of you, simply as a matter of convenience to you and for your accommodation. I will continue to charge the whiskey to you each month and whenever that company fails to pay any draft I will immediately draw on you. If this proposition meets with your approval advise me and I will make the drafts as you direct. You will remember that I wanted to transfer the contract to a corporation formed by my sons and myself to operate the distillery and you said that arrangement would suit you provided I would guarantee that the corporation would perform the contract, and I told you I would. After that and before we accomplished anything you suggested you had transferred the contract to the Distilling Co., and I wrote you that I was willing provided you would guarantee that that corporation should carry out the contract with my corporation, as I had agreed to guarantee for mine, but you have never answered my letter on that subject, and I should be glad if you would do so, as the change should be made if we are to make it at all."

To this letter defendants made no reply, and the next shipment of whiskey was made to the defendants, who paid the same, but they wrote the plaintiff stating that, as their interest in the contract had been transferred to the Kentucky Company, they would not honor any further drafts. On January 13, 1900, plaintiff wrote defendants, repeating his claim that he did not propose to accept the Kentucky Company in lieu of defendants, unless the defendants would guaranty the performance of the contract, and on January 18, 1900, wrote the defendants as follows:

"I will have about 700 barrels of January whiskey in a few days, and if you want it made so as to turn over to Kentucky Company I will do so by your saying you want me to do so and it shall in no way prejudice or in any way invalidate our contract, and that you will agree if not protected by the Kentucky Company, all drafts in fulfillment of our contract in full your firm will carry it out to the letter. Then I will draw drafts and make receipts to them. * * *"

Thereafter the parties, by letter and telegrams, continued to dispute about the question of the assignability of the contract and guaranty of performance by defendants, the defendants stating, inter alia, that the Kentucky Company was complaining of the nonfulfillment of the contract, and plaintiff stating that he would continue to forward the whiskey to the defendants. On March 28, 1900, the attorney for the Kentucky Company wrote plaintiff the following letter:

"The contract of April 12, 1899, between P., A. & Co. and yourself, and the correspondence has been submitted to me as counsel for Kentucky Company. You have frequently been advised by P., A. & Co. and the Kentucky Company that the April 12, 1899, contract was properly and legally assigned to the Kentucky Company, which is, and since April 12, 1899, the date of the assignment of the April 12, 1899, contract to the Kentucky Company, has been entitled to

have you perform the contract according to its provisions. I am of the opinion and have so given it to the Kentucky Company, that P., A. & Co. have a right to assign the contract. The contract by its very language is expressly made to run in favor of and be obligatory upon the assigns of the parties. The Kentucky Company, being the assignee of the contract and being entitled to have you perform its provisions, has demanded of you frequently that you make such performance, and thus far you have failed and refused to comply with such request.

"If you persist in such failure and refusal on your part you will necessitate other and different action on the part of the Kentucky Company, which will be compelled to regard your action as a complete and final violation of the contract on your part and will then undertake to hold you liable for damages for non-compliance.

"You seem to think that you are entitled to have P., A. & Co., guarantee the Kentucky Company. P., A. & Co. having a right to assign the contract, did assign it, and the Kentucky Company is entitled to demand strict compliance on your part with its provisions. As to whether or not P., A. & Co. would be liable in case the Kentucky Company violated the agreement is a question with which the Kentucky Company is not concerned and which is not now pertinent to this discussion.

"You are already in substantial default, but before advising the company to take final action I send you these lines, to which I invite reply by early mail."

## On April 2, 1900, plaintiff wrote to defendants the following letter:

"I enclose you a copy of a letter this day written to Levy Mayer, General Counsel of Kentucky Distilleries & Warehouse Company by my attorneys, Walker & Slack, in relation to my contract with you. I cannot agree to release you from your old obligation assumed in your contract with me, and do not consider that you have the right to be released without my consent. On December 28, 1899, I wrote you, offering to make drafts upon the Kentucky Distilleries & Warehouse Company for each month's production, on condition that I should continue to charge you with the goods and credit you by the payments made by the Warehouse Company, and the further consideration that if that Company should fail to pay at any time, I should make draft upon you. That I was willing to do that for your convenience and accommodation, as you had stated that you did not want the trouble of having to make the entries on your books. I am still willing to do as I then proposed, but am not willing to do anything that will release you from your contract with me. * * * It seems to me that if you construe the contract to mean that you have the right to make a transfer without my consent, and thus release yourself, you are wrong in your construction, and if you do not intend to thus be released, then there is no reasonable objection to your agreeing to remain bound.

"I much prefer settling this matter without litigation, and hope you may see your way clear to an amicable adjustment.

"Please let me know your final conclusion."

## The letter enclosed was as follows:

"We do not think the word 'assigns' as used in the contract can properly be construed to mean that either party has the right to substitute another in its place, or make any transfer without the consent of the other party to the contract. To construe it otherwise would be to construe that whenever P., A. & Co. should find it unprofitable, or undesirable, all that they need do would be to make a transfer and tell Field to look to the transferee, and if the transferee should become insolvent, Field would be without any enforceable contract.

"If Field would recognize the Kentucky Company by collecting from it, he would be construed as consenting to the transfer.

"To summarize the question, Field insists that P., A. & Co. have no right to make any transfer or to relieve themselves from their obligations assumed under their contract, without his consent, and that he will not consent or do any act that will be construed into a consent except they first consent to re-

main bound. If P., A. & Co. do not intend to be released from their obligations, then all they need do is to agree to remain bound, as required by Field, in his letter of December 28, 1899.

"We make this suggestion after a partial examination of the authorities, though we think the question is elementary. If P., A. & Co. do not desire to relieve themselves of this contract there is no substantial question involved justifying litigation."

Thereafter plaintiff offered to compromise in order to avoid litigation, and defendants refused, threatening plaintiff that he was in danger of putting himself in default. On June 23, 1900, plaintiff wrote as follows:

"I certainly have never desired any litigation, and do not now desire it, and am glad to hear you take the same view. In order to avoid all controversy, I am willing to deliver the whiskey to Kentucky Distilleries & Warehouse Co. and accept payment from it so long as it shall continue to receive and pay for same as stipulated in my contract with you, but will do this without waiving, or intending in any way to waive the right to demand that you shall take and pay for the whiskey until the termination of the contract, if at any time the Kentucky Distilleries & Warehouse Company shall in future make default. So as directed by you, I will make draft on that Company within next ten days for the remainder of the past season's crop with warehouse receipts attached unless in the meantime you shall notify me, after receiving this, not to do so.

"I assure you that all I want is to do nothing that will be considered a waiver of my contract, and as you do not consider that I will waive it with you by delivering the whiskey to Kentucky Distilleries & Warehouse Company under your direction, I am, of course, willing to do it."

Defendants replied as follows:

"We consider that your conduct throughout this whole transaction has made it impossible for us to treat with you upon any basis.

"We cannot give you directions as to what you should do with the Kentucky Company. These are questions which must be settled between you and that Company. After conference with our counsel, we do not intend by any action of ours to revive any of your rights against us which may have been affected by your treatment of the transaction. You have by your attitude placed us on the defensive. You have threatened to sue us and we in turn must keep ourselves in a position, therefore, where in the event you carry out that threat we may take advantage of any technicalities of the situation."

On July 2, 1900, plaintiff sent draft, with warehouse receipts, for 2,200 barrels to the Kentucky Company, which it refused to receive. On July 5, 1900, plaintiff telegraphed the Kentucky Company asking for an explanation of the refusal. The Kentucky Company replied as follows:

"The papers are incorrect; were returned to the bank with explanation to the bank to that effect. We wish to state that in refusing to accept your draft for the above reason we do not waive our rights to refuse acceptance of any future drafts for any other cause which may exist in our favor under our contract with you."

Plaintiff continued to request an explanation from the Kentucky Company and the defendants as to the refusal of the Kentucky Company to pay the draft, and for an explanation wherein the papers were incorrect. On July 12, 1900, the Kentucky Company wrote plaintiff as follows:

"The presentation of your draft was the first notice we had of your intention to carry out your contract. In returning your draft, for the reason that the papers were incorrect, we at once notified you that there were possible

objections to accepting any draft which you might present for whiskey deliverable under the contract. We have been informed that the owners of your receipts have on several occasions failed to obtain whiskey represented by such receipts. Before accepting and paying for the warehouse receipts we must insist that an agent of this Company go through your warehouse for the purpose of verifying the receipt.

"This can be easily done. In addition, our executive committee is of the opinion that you should give this Company a bond with good and sufficient surety to secure us against any mistake or error in regard to the whiskey covered by the warehouse receipts. Further, we must have an inspection of each day's run by experts of this Company. We therefore request that you will permit our representative to take samples for each day's inspection of the whiskey deliverable to us under our contract for submission to this office for approval."

The subsequent correspondence between the parties is immaterial, except to show that the Kentucky Company, taking advantage of trivial and technical mistakes not going in any way to the root of the contract, insisted upon the conditions as to bonds and inspection, which were unauthorized by the contract. The correspondence, however, shows that after July 2, 1900, the date of the tender of whiskey and warehouse receipts to the Kentucky Company under the contract, it continued to negotiate with the plaintiff, and assumed the existence of the contract during July and August, and on September 25, 1900, it sent to plaintiff a bond to be signed by him, for $100,000, against default in the performance of said contract. In said bond the Kentucky Company inserted, inter alia, the following statement:

"Whereas, said contract and all the right, title and interest of said Paris, Allen & Co. therein, thereto and thereunder have heretofore been assigned and transferred by said Paris, Allen & Co. to Kentucky Distilleries & Warehouse Co., a corporation of New Jersey, and said corporation accepts such assignment and transfer but desires an instrument of indemnity and protection and agrees to become the party of the first part to said contract in the place and stead of said Paris, Allen & Co., and which assignment is hereby consented to by said Field; and

"Whereas, said Kentucky Distilleries & Warehouse Co. is ready to carry out the terms and conditions of said contract upon its part to be carried out and performed, provided said Field makes no default in the performance of any terms and provisions in said contract contained by him to be performed, and provided, further, that this instrument is executed and delivered to said Kentucky Distilleries & Warehouse Co."

To this letter plaintiff made no reply. In October and November, 1900, plaintiff and the Kentucky Company had some correspondence in regard to the mistakes in the earlier invoices, but no further material reference was made to the contract, and plaintiff notified the defendants that he would make the whiskey as agreed for them during the season of 1900 and 1901, and each month forwarded the whiskey and drew on defendants for the amounts due under the contract, but defendants failed to pay therefor, and the plaintiff, having originally, in February, 1901, brought an action to recover damages for the whiskey manufactured under said contract which defendants had refused to receive, abandoned said action, and on October 14, 1901, brought this action, in which, inter alia, it is alleged as follows:

"Fifth. The plaintiff says that on or about the 12th day of February, 1901, and on divers occasions before that time, the said defendants refused to receive or to accept the warehouse receipts tendered, or in any way to perform their contract for the purchase of said whiskey, and notified the plaintiff that

they were no longer bound by said contract, and intended no longer to execute and perform the same, or any part thereof, during the remainder of the 15 distilling seasons, and they permanently abandoned said contract and refused to perform the same, or to permit him to perform the stipulations he had undertaken to perform, and they denied, and still deny, that they are bound to perform, and avow that they do not intend further to perform or permit this plaintiff to perform said contract, and openly claim that the same is no longer in force, and no longer valid or enforceable against them."

This allegation is admitted by the fifth paragraph of defendants' answer, in which defendants state, inter alia, that on divers occasions before February 12, 1901, they refused to receive or accept the warehouse receipts tendered by plaintiff, and that on said date they claimed, and still claim, that said contract is no longer in force or valid or enforceable against them, because of plaintiff's breach thereof, and that by reason of such breach they refused to be further bound by said contract.

As bearing upon the effect of plaintiff's offer to fulfill the contract with defendants' assignee, the Kentucky Company, the following letter from defendants to plaintiff, dated November 8, 1899, is important:

"Would it make any difference to you if you waited a little later in the season and ran later in the spring? There would be no objection on our part or that of the Kentucky Distilleries & Warehouse Co. to June goods. We would not want any made in July however. If you can just as well arrange in this way—delaying your starting as late as possible and then running full capacity, making your last drawing late in June, it would suit our arrangements very much better. Furthermore, it would have a good effect on everybody in your neighborhood who is proposing to make whiskey."

Thus the defendants requested such an extension of the distilling season as would permit deliveries in July.

The original contract was made without the knowledge of the plaintiff that it was really for the benefit of the Kentucky Company. In fact, the first letter from the defendants stated that they had sold out their distilleries to the Kentucky Company and wished to substitute plaintiff's whiskey in their own business. It appeared from the evidence that in 1900 the Kentucky Company was reported to be in failing circumstances, and the president of the company testified that, in order to save the credit of the company, he had indorsed for it gratuitously; that "he stood to lose at the time," but by reason of his pride in the success of the company he made said indorsements. The court correctly charged the jury on the question whether the plaintiff or defendants first repudiated the contract, and stated that, if the plaintiff was the first to repudiate it, he could not recover unless such repudiation was subsequently waived. The court further charged the jury that the defendants had the right to assign said contract, and were not thereby released from liability, and that it was the duty of plaintiff to make deliveries to the Kentucky Company under said contract, unless released by the acts of defendants. The court then reviewed the correspondence between the parties, and the evidence as to the insolvency of the Kentucky Company, and the claim of the plaintiff that the conduct of defendants showed that it was their obvious purpose to procure a release of the liability under said contract, and the claim of defendants that they declined to be bound by the contract because of the breaches on the part of the plaintiff already referred to, and that, having once declined

to carry it out, the Kentucky Company refused to revive it except upon the furnishing of a bond by plaintiff. The charge of the court on this branch of the case was quite full, and much of it was excepted to by defendants, but these exceptions need not be discussed, because the evidence is all in writing, and, in our opinion, warranted instructions less favorable to defendants than what were actually given. The evidence abundantly justified the conclusion that defendants made the assignment, not in good faith, but for the purpose of securing a release from their liability under the original agreement, and sought to trick the plaintiff into some act or omission which might be availed of as a plausible excuse for defendants' own delinquency, and that the endeavors of plaintiff to reach a fair understanding of the situation were not evidence of such a repudiation on his part as would justify the defendants in rescinding the contract.

The practical construction put upon the contract by both parties was that the contract was not assignable by either party without the consent of the other party. The plaintiff so stated in his original letter. The defendants accepted said statement, and put the same practical interpretation upon the contract by refusing to accept the plaintiff's proposed agreement to assign, and substituting one prepared by their counsel. By defendants' proposed contract it was provided, inter alia, that the Field corporation should agree to perform the said contract with the Kentucky Company "the same as though said contract of April 12, 1899, had been made by and between" the Kentucky Company and the Field corporation, and it specifically provided for a guaranty by the plaintiff of performance of the contract by the Field corporation. When the plaintiff insisted that he was entitled to a similar guaranty, no reply was made to his letter, but the defendants wrote afterwards, giving further instructions as to the way in which they, the defendants, wished the contract to be carried out. Subsequently, when plaintiff shipped whiskey to them and drew on them therefor, they refused to honor any further drafts, as their interest in the contract had been transferred to the Kentucky Company; and, when they transferred the shipments of whiskey to the Kentucky Company, they explained their conduct on the ground that the contract had been turned over to the Kentucky Company, who had assumed the same and would pay for the whiskey. Plaintiff offered to make shipments to the Kentucky Company as requested by defendants, on condition that by so doing he was not to be considered as in any way releasing defendants from their contract. But the defendants made no reply to this letter. The only suggestion made by plaintiff was that, if defendants did not intend to take advantage of assignment to the Kentucky Company in order to secure a release from their obligation, there was no reasonable objection to their stating that they agreed to remain bound by the contract. The letter of counsel for plaintiff takes the same ground, while the letter from counsel for defendants, referring to the question as to whether the defendants would be liable by reason of plaintiff's dealings with the Kentucky Company, disposes of the question by saying that it is one "with which the Kentucky Company is not concerned, and which is not now pertinent to this discussion." The subsequent correspondence does not show a situation in any way more favorable to defendants, and need not be discussed.

Prior to the close of the distilling season, as extended to July, 1900, the plaintiff offered to fulfill the contract with the Kentucky Company, and on July 2d duly tendered the whiskey to the Kentucky Company, in accordance with the contract. Up to that time the defendants had not elected to treat the contract as broken. They continued to treat the contract as existing for several months thereafter, and, while they were making technical objections, they were still negotiating with plaintiff and assuming the existence of the contract. In these circumstances the court would have been justified in instructing the jury to render a verdict for the plaintiff on the ground that defendants had expressly and specifically repudiated the contract, when there had been no breach on the part of the plaintiff which entitled them to do so.

Various errors were assigned to the charge of the court and its refusal to charge upon the question of damages. These will be considered in the order in which they were discussed in defendants' brief.

The first point is stated as follows:

"Defendants were entitled to an instruction to the effect that no damages, or, at most, only nominal damages, might be recovered against them, because, under the agreement, defendants were entitled not only to the services, but the exclusive output of plaintiff's distillery, etc. Upon defendants' breach, plaintiff was obligated to employ his services and plant to minimize defendants' damages. Therefore, in mitigation of damages, defendants are entitled to be credited with all revenues which might be obtained by plaintiff in the operation of said plant during the term of the agreement. These revenues could only be ascertained at the expiration of the agreement."

These questions are raised by exceptions to the refusal of the court to charge as follows:

"That if the jury believe from the evidence that the plaintiff, Field, on or after October 14, 1901, received, or could by reasonable efforts have received, contracts for the purchase of all or a part of his crops about or thereafter to be manufactured by him for or during any part of 13 distilling seasons then ensuing, at prices equal to or in excess of the cost of the manufacture of the same, it was his duty to make such contracts in order to reduce his losses, and, consequently, the damages he claims in this case."

Also, by the exception to the admission of evidence showing the cost of the manufacture of whiskey during the seasons of 1899–1900, and 1900–1901, and the average cost or profit of warehousing such whiskey, and of the high and low price of cash corn on the Chicago Board of Trade for the months of October, from 1873 to 1901, both inclusive, said latter evidence having been offered in connection with the probable cost of future crops of whiskey.

The general rule is that an unqualified refusal, without legal excuse, to further perform a continuing executory contract, authorizes the injured party to sue at once for any damage he has suffered from the breach. Roehm v. Horst, 178 U. S. 1, 20 Sup. Ct. 780, 44 L. Ed. 953; Marks v. Van Eeghen, 88 Fed. 853, 30 C. C. A. 208; Masterton v. The Mayor, 7 Hill, 61, 42 Am. Dec. 38; Devlin v. The Mayor, 63 N. Y. 25; In re Stern, 116 Fed. 604, 54 C. C. A. 60; Hochster v. De La Tour, 2 El. & Bl. 678. The measure of damages in such a case is the difference between the contract price and the cost of manufacture. Hinckley v. Pittsburgh Bessemer Steel Co., 121 U. S. 264, 271, 7 Sup. Ct. 875, 30 L. Ed. 967.

"Whenever one party thereto is guilty of such a breach as is here attributed to the defendant, the other party is at liberty to treat the contract as broken, and desist from any further effort on his part to perform; in other words, he may abandon it, and recover as damages the profits which he would have received through full performance. Such an abandonment is not technically a rescission of the contract, but is merely an acceptance of the situation which the wrongdoing of the other party has brought about." Anvil Mining Co. v. Humble, 153 U. S. 540, 14 Sup. Ct. 876, 38 L. Ed. 814.

The defendants do not controvert the doctrine laid down in these cases, but seek to distinguish the case at bar, on the ground that it involved the breach of an exclusive output contract; and they contend that in such a case it is the duty of the manufacturer, in order to minimize the damage, to devote his entire capacity to the manufacture of the article contracted for for others, if a demand exists for the article. Counsel for defendants says in his brief as follows:

"Plaintiff was bound to continue to operate said distillery and employ his services in the future years in the same general manner as he would have been obligated to employ them had the agreement been in the course of performance. * * * If the plaintiff in the present case could have sold the output of his distillery in the market at a price above the cost of production, then he sustains no greater damage than the difference between market price and the price at which defendants contracted to take the whiskey, and no greater damages should have been awarded him. As we have already pointed out, the plaintiff not only could have sold the output of his distillery in the market at a price above the cost of production, but at a price considerably above the price at which Paris, Allen & Co. contracted to take the whiskey."

A preliminary objection to this contention is found in the evidence that this agreement was not one for the manufacture and sale of the entire output of plaintiff's factory. It was expressly provided that, if the price of corn on the first Tuesday of October should exceed 45 cents per bushel, the plaintiff would not be obligated to manufacture and deliver the defendants any whiskey; but that, if he should manufacture in excess of 500 barrels in such season, he would then be obliged to manufacture an agreed amount for defendants. Furthermore, it was provided that the plaintiff should have the right to manufacture for his own use not to exceed 500 barrels of whiskey, during any of said distilling seasons, in excess of the quantities to be manufactured for the defendants, and that he might further manufacture whiskey in excess of said 500 barrels by a payment of $5 a barrel to the defendants. The only limitation upon such manufactures and sales by the plaintiff in excess of the amount contracted to be manufactured and sold to defendants was that said whiskey should not be sold to any distillery or wholesale liquor dealer in the United States. But we are not aware of any rule of law which would have obliged this plaintiff, whether his contract was for an exclusive output or otherwise, to risk his capital in, and devote the capacity of his factory during a period of years to, the manufacture of whiskey in order to attempt to minimize the damages for which the defendants are liable by reason of their breach of the contract. No federal case has been called to our attention which supports any such view, or which indicates that a different rule of law is to be applied in the case of a breach of a contract for an exclusive output, as distinguished from other contracts to manufacture. The two federal cases

cited by counsel for defendants are Warren v. Stoddart, 105 U. S. 224, 26 L. Ed. 1117, and Wicker v. Hoppock, 6 Wall. 94, 18 L. Ed. 752. These cases do not support his contention. In Wicker v. Hoppock the court stated that where a party was entitled to the benefits of a contract, and could save himself from a loss arising from a breach of it at a trifling expense or with reasonable exertions, it was his duty to do so, but refused to apply the rule in said case, because the contract was one which provided for a payment, as distinguished from one of indemnity, and held that, in the former, a recovery might be had as soon as there was a breach of the contract, and that the measure of damages was the full amount agreed to be paid. In Warren v. Stoddart the court found that there had been no breach of contract, and held that no damages were recoverable by the defendant, who claimed that said contract had been broken, and who sought to set off damages which he had unlawfully aggravated; and held that, even if he had been entitled to recover, he could not wantonly and unlawfully aggravate the damages. Kincaid v. Price (Colo. App.) 70 Pac. 153, and Frazier v. Clark, 88 Ky. 260, 10 S. W. 806, 11 S. W. 83, were chiefly pressed on the argument in support of the exclusive output contention. In Kincaid v. Price, decided by the Court of Appeals of Colorado September 8, 1902, it is not clear that the fact that the contract was for an exclusive output had any bearing on the decision of the court that the measure of damages was the difference between the market value and the contract price. The court, relying on some statements of text-writers and early decisions of courts not of last resort, held that the above rule was the general rule for measuring damages in actions for breach of such executory contracts. In Frazier v. Clark it appeared that the plaintiffs, after breach of the contract, continued to operate their mill until it was sold, "making as much or more profit than would have been made if the contract had not been violated by the defendant." Of the 13 cases cited in support of the alleged distinction, the foregoing are the only ones which involved the element of an exclusive output. In five of the other cases the proof showed a tender of other goods or employment to the plaintiff after the breach, and an opportunity to make use of the mill, or wagon, or ship for the services of which the contract had provided. In Dunn v. Daly, 78 Cal. 640, 21 Pac. 377, the plaintiff himself broke the contract. In Peck & Co. v. Kansas City Metal Roofing & C. Co. (Mo. App.) 70 S. W. 169, the court applied the rule of master and servant to an advertising contract. The cases of Everson v. Powers, 69 N. Y. 527, 42 Am. Rep. 319; Bassett v. French (Com. Pl.) 31 N. Y. Supp. 667; Mt. Hope Cemetery Association v. Weidenmann, 139 Ill. 67, 28 N. E. 834; and Sommer v. Conhaim et al. (Sup.) 54 N. Y. Supp. 146—are all personal service cases, and, even if analogous to the case at bar, do not support defendants' contention.

The rule of damages in personal service cases is laid down in Pierce v. Tenn. Coal, Iron & R. R. Co., 173 U. S. 1, 19 Sup. Ct. 335, 43 L. Ed. 591, where the court says:

"But he had the right to elect to treat the contract as absolutely and finally broken by the defendant; to maintain this action, once for all, as for a total breach of the entire contract; and to recover all that he would have received in the future, as well as in the past, if the contract had been kept. In so

doing he would simply recover the value of the contract to him at the time of the breach, including all the damages, past or future, resulting from the total breach of the contract. * * * In assessing the plaintiff's damages, deduction should, of course, be made of any sum that the plaintiff might have earned in the past or might earn in the future, as well as the amount of any loss that the defendant had sustained by the loss of the plaintiff's services without the defendant's fault."

The general rule in the case of a manufacturer or vendor is restated and applied by the United States Supreme Court in Roehm v. Horst, 178 U. S. 1, 21, 20 Sup. Ct. 780, 788, 44 L. Ed. 953 :

"If a vendor is to manufacture goods, and during the process of manufacture the contract is repudiated, he is not bound to complete the manufacture, and estimate his damages by the difference between the market price and the contract price, but the measure of damage is the difference between the contract price and the cost of performance. Hinckley v. Pittsburgh Company, 121 U. S. 264 [7 Sup. Ct. 875, 30 L. Ed. 967]. Even if in such cases the manufacturer actually obtains his profits before the time fixed for performance, and recovers on a basis of cost which might have been increased or diminished by subsequent events, the party who broke the contract before the time for complete performance cannot complain, for he took the risk involved in such anticipation."

The evidence as to the cost of producing the two prior crops of whiskey, and of the price of corn in preceding years, furnished a basis on which the jury might reasonably determine the probable cost of future crops of whiskey.

"The jury, in assessing the damages, would be justified in looking to all that had happened or was likely to happen to increase or mitigate the loss of the plaintiff down to the day of trial." Hochster v. De La Tour, supra.

"It should be borne in mind that the difficulty of making proof springs, like the plaintiff's right to recover damages, out of the wrongful act of the respondents, who should not be suffered to reap advantage from their own wrong by requiring that kind of proof which their wrongful action has rendered it impossible or difficult for the plaintiff to obtain." Lincoln v. Orthwein, 120 Fed. 880, 57 C. C. A. 540.

In Anvil Co. v. Humble, supra, plaintiffs contracted to remove all of the ore in one of the shafts of defendant's mine. Defendant refused to permit plaintiffs to complete their contract. The same objection was made there as is here made—that the future profits were uncertain. The Supreme Court held that testimony as to the cost of mining each ton of ore, and as to the amount of ore on hand when the work was stopped, was admissible to show the profit which plaintiffs would have made, and said as follows:

"It is true that the cost of mining the remaining ore might differ from that of mining the ore which had already been taken out. But still, proof of the cost of taking out that which had been mined, and of the condition of the mine as it was left, furnished a basis upon which a reasonable estimate could be made as to the cost of extracting the remaining ore."

Wakeman v. Wheeler & Wilson Mfg. Co., 101 N. Y. 205, 4 N. E. 264, 54 Am. Rep. 676.

We conclude, therefore, that the foregoing exceptions are not well founded.

In connection with said evidence as to the price of corn, defendants further contend that, as plaintiff was under no obligation to manufacture in any year if the price of corn exceeded 45 cents on the Chicago

Board of Trade on the first Tuesday of October in said year, the agreement was not mutually binding, and hence there can be no recovery for years subsequent to October, 1901. This question is raised by the refusal of the court to charge that, if the jury should find that the price of corn in October, 1901, was more than 45 cents, the contract to manufacture was optional with the plaintiff, and he could not recover any damages by reason of defendants' refusal to receive and pay for any whiskey thereafter to be delivered by plaintiff, and to its charge as follows:

"If you believe from the evidence that the plaintiff would have taken advantage of that provision of the contract in the years 1901 and 1902, when the price of corn was in excess of 45 cents per bushel, as appears by the proofs, and would not have manufactured whiskey during those years, then you ought not to allow plaintiff any damage for those years, or for any other years in which you believe from the evidence that he would not have manufactured any whiskey for the use of defendants. * * * The question of the future price of corn as bearing on the plaintiff's damages is of prime importance. It is for you to say, from all the evidence and circumstances what the probabilities are with respect to the continuance of the price of corn at the rate of 45 cents per bushel, and whether in view of all the facts, it was probable that plaintiff would have manufactured whiskey at a profit in succeeding years, and in years when the price of corn exceeded the sum stated."

And counsel for defendants argues that the jury were thus left to conjecture whether the price of corn would exceed 45 cents, and, if so, whether plaintiff would have continued to manufacture, and, if so, whether he would have met a loss or made a gain, and that the future prices were to be determined by the past prices of corn. Counsel for defendants have referred us to a line of authorities which hold that, where a contract is unilateral by reason of the absence of any obligation on the part of one of the parties to perform, it cannot be enforced, and only nominal damages can be recovered for the breach by the other party. We are not disposed to question the correctness of this proposition, but we think the case at bar does not fall within the rule thus stated. It is well settled that a contract for a sale, which leaves it practically optional with one of the parties as to the fulfillment of the agreement to manufacture or to purchase, the price to be paid, or as to other material portions of the contract, will be held to be void, and no damages can be recovered for its breach. Troy Laundry Machine Co. v. Dolph, 138 U. S. 617, 11 Sup. Ct. 412, 34 L. Ed. 1083; American Cotton Oil Co. v. Kirk, 68 Fed. 791, 15 C. C. A. 540; Crane v. C. Crane & Co., 105 Fed. 869, 45 C. C. A. 96. In the Dolph Case, on which much stress is laid by counsel for defendants, the court held that damages could not be recovered for the breach of indefinite provisions in respect to an option in favor of one party as to a matter merely incidental and subordinate to the main contract. But in the case at bar the contract provided for the exercise of options by either party as to the performance of the main agreement for manufacture, upon sufficient and mutual considerations. The option reserved by the plaintiff was not one which necessarily, or within the contemplation of the parties, extended during the whole of the term of the contract, but was a provision for the mutual protection of the parties as to said main obligation in case the price of corn should be 45 cents per bushel in any season or seasons during the term of said contract. It did not give to plaintiff a right arbitrarily to terminate the contract, but only on certain conditions, which might

never arise. Anvil Co. v. Humble, supra. By the contract the plaintiff was absolutely bound to manufacture and deliver the exclusive output of his factory, with certain exceptions already noted, during each year of the term of the lease. The proviso which relieved him from this obligation when the price of corn should exceed 45 cents was one which also virtually contained a penalty for such failure to manufacture for defendants, in that it denied him the privilege of manufacturing any whiskey during such season, except 500 barrels for his own use, unless he should also manufacture and deliver to the defendants at the contract price, and at their option, 5,000 barrels during such season. The contract, therefore, was one binding upon the plaintiff, when the price of corn was 45 cents, either to manufacture as agreed, or to practically close his entire plant. In view of these mutual stipulations relating to said qualified option, and which served as a consideration passing to and from each of the parties, we think the obligation was a mutual one, and that the question of the right of recovery was properly left to the jury under the instructions of the court as given above.

The contract contained a provision that, in case of fire or accident which might prevent plaintiff from manufacturing in any one season, he should be excused for such failure. It is not claimed that this provision made the contract unilateral. And if the contract had contained an agreement that, in case of a strike, the entire failure of the corn crop, or the death of the plaintiff, in any year, the manufacturer should be relieved from the obligation of fulfilling the contract during the year when such casualty happened, it could not reasonably be claimed that such agreement constituted a defense against all claims for damages suffered during a period of years by reason of the default of the other party. And yet the charge requested by defendants as above was to the effect that, if the price of corn at the time when they, the defendants, broke the contract, happened to be more than 45 cents per bushel, the plaintiff could not thereafter recover any damage by reason of defendants' breach. The object sought, in case of a breach of contract, is to secure to the party just compensation for his damages suffered by reason thereof. It would be a travesty upon justice to apply the rule contended for by defendants, and thus enable them to escape all liability, because of the possibility that plaintiff might at some time have the right to exercise said option, and elect so to do at the penalty of closing his plant.

The next exception is to the exclusion by the court of evidence that whiskey was manufactured by the plaintiff during the season of 1901 and 1902, and of the price at which said whiskey was sold. It was stipulated that such evidence, if admitted, would show that the prices received by plaintiff were largely in excess of the contract price. Counsel for plaintiff argues that, as defendants had no further interest in plaintiff's business after the repudiation of the contract, it was immaterial whether or not he continued thereafter to manufacture. We have already discussed this contention. But while, in the absence of evidence as to plaintiff's actual loss, the rule of damages is as stated above, yet, as the first consideration is to ascertain actual damages where possible, if evidence is available of manufacture and sale after such breach, such evidence should go to the jury, in order to enable them the more nearly to approximate plaintiff's actual damages. Diamond Co. v. San An-

tonio R. R. Co. (Tex. Civ. App.) 33 S. W. 987; Hochster v. De La Tour, supra; Wakeman v. Wheeler & Wilson Mfg. Co., supra. Especially is this so, in view of the admission of evidence as to the value or profit to plaintiff derivable from storage. If the jury were at liberty to award plaintiff damages for storage during the years succeeding the breach, they were bound to deduct therefrom such amounts as plaintiff actually received for his warehouse and factory during said season of 1901–1902. The exclusion of said evidence was clearly error. The ruling was directly contrary to the views expressed by the Supreme Court in Hinckley v. Steel Co., supra, where the court said as follows:

"The Circuit Court finds that it would have cost the plaintiff $50 per ton to have manufactured and delivered the rails called for by the contract, according to its terms; that the profits of the plaintiff, if the conduct of the defendant had not prevented it from fulfilling the contract, would have been $8 per ton on each of the 6,000 tons, being $48,000; and that the plaintiff manufactured and sold to other persons 4,000 tons of rails from the materials purchased by it with which to perform the contract with the defendant, and received for such rails $54.60 per ton, and made a profit of $1.60 per ton on the 4,000 tons, being a profit, in all, of $6,400. Deducting this $6,400 from the $48,000 leaves $41,600, for which amount the judgment was finally entered."

Error is also assigned to the refusal of the court to permit expert witnesses to answer the following question:

"Taking a contract for the sale of the product of a distillery, the contract being dated April 12, 1899, covering five distilling seasons for an annual output of 3,000 barrels, and the next ten distilling seasons for an annual output of 3,500 barrels, the distillery being located in Owensboro, Kentucky, and its total capacity being about 3,000 barrels, and the total value of the distillery and property being about $35,000, and the contract price of its output being 30 cents per proof gallon; supposing that two seasons of that contract has elapsed, and that thirteen seasons were still to elapse, at the time when the contract was rescinded or canceled or terminated, what, in your opinion, would be a reasonable deduction for the less time engaged, and for release from care, trouble, risk, and responsibility attending a full execution of the contract; what proportion of the profit which the contract would have yielded, if any, to the manufacturer?"

The exclusion of this evidence is now sought to be justified on the ground that the witnesses were not qualified to testify as experts, and that, in any event, the jury were the sole judges of what deductions were to be made. The witnesses duly qualified as experts, and no objection was made at the trial on the ground that they were not thus qualified. That the defendants were entitled to such deductions is settled by the authorities. Hinckley v. Steel Co., supra; Masterton v. The Mayor, supra; United States v. Speed, 8 Wall. 77, 19 L. Ed. 449. And the court charged the jury to this effect, as appears from the following excerpt from the charge:

"If the jury believe from the evidence that the said defendants committed a breach of said agreement of April 12, 1899, then in estimating the damages, if any, sustained by plaintiff by reason of such breach after October 14, 1901, the jury should make a reasonable deduction for the less time engaged, and for release from care, trouble, risk, and responsibility attending a full execution of said agreement by the plaintiff."

The general rule is well settled that, where a subject is one involving special knowledge upon subjects as to which the jury are not as well able to judge for themselves as one familiar with such matters, the

130 F.—42

testimony is properly admitted to aid them in reaching their conclusion Transportation Line v. Hope, 95 U. S. 297, 24 L. Ed. 477; L. S. & M. S. R. R. Co. v. B. & O. & C. R. R., 149 Ill. 272, 37 N. E. 91; Campbell v. Mayor (C. C.) 81 Fed. 182. In Herring v. Gage, 12 Fed. Cas. 44, Judge Wallace said:

> "By further exceptions the defendants insist that the master's findings as to the actual savings realized by the defendants by the use of this device is not sustained by the evidence. This finding is based in part upon the testimony of various experts who were familiar with the practical working of the device in other mills, and who were permitted to state the quantity of flour lost when the device was not used, thus estimating the saving realized under their observations, and basing upon that their opinion of the saving ordinarily gained by the use of the device. The conditions under which the device was used differed in the different instances observed by the witnesses. It is contended that this testimony is not entitled to consideration. To this I cannot agree."

In the case at bar it would be difficult, if not impossible, for a jury in the city of New York to determine with any degree of accuracy what would be a reasonable deduction for time and release from risk and responsibility attending the execution of a contract for the manufacture of whiskey during a period of years in a distillery in Kentucky, without some testimony from those familiar with such business. The determination would involve, inter alia, questions of wear and tear, of insurance, of cost of maintenance and care of the property, and the testimony of experts on those subjects was competent and material. The particular question, however, was too comprehensive; it was not calculated to elicit the experience of the witness, from which the jury might have drawn its own conclusions, but called for a general conclusion of the witness upon all the elements involved. In other words, it sought to substitute the witness for the jury as assessor of the damage, and objection to it was properly sustained.

Error is further assigned to the admission of evidence as to the cost of storage of whiskey, and the profit per year on such storage, and exception is taken to the refusal of the court to charge that the plaintiff was not entitled to recover damages for loss of expected profits by reason of the storage of whiskey which might have been manufactured under said agreement. This question as to the allowance of damages for lost profits on storage is not free from doubt. In view, however, of the distinct provision in the contract for payment of storage, we think it was competent to show the usual custom as to storage in such cases, as indicating the profit which was in the minds of the parties when the contract was entered into, especially in view of the testimony of one of the defendants:

> "The profits which would have been realized had the contract been performed, and which have been prevented by its breach, are included in the damages to be recovered in every case where such profits are not open to the objection of uncertainty or of remoteness, or where, from the express or implied terms of the contract itself, or the special circumstances under which it was made, it may be reasonably presumed that they were within the intent and mutual understanding of both parties at the time it was entered into." Howard v. Stillwell & Bierce Mfg. Co., 139 U. S. 199, 206, 11 Sup. Ct. 500, 503, 35 L. Ed. 147.

Cincinnati Gas Co. v. Western Siemens Co., 152 U. S. 200, 14 Sup. Ct. 523, 38 L. Ed. 411.

It was conceded that the universal custom of the whiskey trade is to keep Kentucky whiskey in the warehouse for several years, and that there is a profit in such business. One of the defendants testified that the business of warehousing whiskey is a very safe source of revenue to the distiller, and that, even if the distiller were to sell his product at cost, he could still count upon the average of three or four years' storage of the whiskey before it leaves his hands. The charge of the court on this point was as follows:

"It is claimed that the sum of five cents per barrel for storage monthly, which the defendants agreed to pay, would have been a strong inducement to continue such manufacture, especially as it is the custom of the trade to allow barrels of whiskey to remain in storage for two or three years after manufacture. This is an item of testimony which you should consider; in connection, however, with the fact that it does not appear how long the whiskey would have remained in storage if the contract had been performed. Its disposition was absolutely in the control of the defendants after the delivery of the warehouse receipts to them. The warehouse receipts were constructive deliveries of whiskey, and are transferable by indorsement. And it follows that whiskey which remains on storage, and which has been delivered in the manner stated, may be removed from storage whenever the owner desires its removal. You should consider these circumstances in making your calculations to ascertain plaintiff's gain and profit, provided you conclude he has sustained damage."

We think this charge was justified by the evidence, and was sufficiently favorable to defendants.

The judgment is reversed, and the case remanded for a new trial.