## CRICHFIELD v. JULIA.

### (Circuit Court of Appeals, Second Circuit. June 16, 1906.)

### No. 229.

**1. CONTRACTS—CONSTRUCTION—PERFORMANCE.**

Where plaintiff agreed to use his best endeavors to secure concessions from the government of Venezuela to authorize the removal of asphalt from a mine in that country, which plaintiff agreed to obtain for defendant, the contract was performed by plaintiff procuring an assignment to defendant of a concession from the government to the vendor of the mine.

[Ed. Note.—For cases in point, see vol. 11, Cent. Dig. Contracts, §§ 1249–1280.]

**2. SAME—ACTIONS—EVIDENCE.**

Where, in consideration of plaintiff's endeavors to procure an asphalt mine for defendant, the latter agreed to pay plaintiff $5,000 cash and preferred stock in a corporation to be organized to operate the mine of the par value of $100,000, and thereafter defendant participated in the organization of the corporation and turned over the mine to it in return for stock, furnishing the only property which the corporation had, evidence that such corporation was organized with a capital stock of $50,000, which was afterwards increased, and that a portion of the stock was issued for the property in various concessions, connected therewith, etc., was not objectionable for failure of proof that such was the corporation contracted to be formed.

**3. DAMAGES—BREACH OF CONTRACT—UNCERTAINTY.**

Where defendant agreed to pay plaintiff $5,000 and a portion of the preferred stock of a corporation to be organized to exploit an asphalt mine in consideration of plaintiff's services, and the plaintiff performed his part of the contract, and the corporation, by working the mine, had received and was receiving large amounts of valuable asphalt, plaintiff was not precluded from recovering the value of the stock contracted to be issued because of uncertainty as to its value, for the reason that defendant purposely refrained from issuing preferred stock so that there was no market value therefor.

[Ed. Note.—For cases in point, see vol. 15, Cent. Dig. Damages, § 5.]

**4. SAME.—DETERMINATION.**

Where defendant, in consideration of plaintiff's services, agreed to pay him $5,000 and certain preferred stock in a corporation to be formed, but, after forming the corporation defendant purposely refrained from issuing such preferred stock, plaintiff was entitled to recover an amount equal to the value of such stock, if issued, to be determined with reference to the value of the corporation's assets and activities.

[Ed. Note.—For cases in point, see vol. 15, Cent. Dig. Damages, §§ 285–289.]

**5. ERROR, WRIT OF—RULINGS ON EVIDENCE—PREJUDICE.**

Where there was evidence, unobjected to, showing that defendant actually took part in the formation of a corporation to exploit a particular asphalt mine, defendant was not prejudiced by the admission of copies of telegrams offered for the same purpose.

[Ed. Note.—For cases in point, see vol. 3, Cent. Dig. Appeal and Error, §§ 4161–4170.]

In Error to the Circuit Court of the United States for the Southern District of New York.

See 137 Fed. 969.

Writ of error by defendant in the court below to review judgment for plaintiff entered upon the verdict of a jury in the United States Circuit Court for the Southern District of New York.

L. Laflin Kellogg, for plaintiff in error.

W. B. Crisp, for defendant in error.

Before TOWNSEND and COXE, Circuit Judges, and PLATT, District Judge.

TOWNSEND, Circuit Judge. This action was brought to recover $100,000, for damages for breach of contract. The material recitals in the said contract are summarized by the court in its charge to the jury as follows:

"The contract was entered into in the city of Mexico. It contains a recital that the plaintiff represented that he knew of the location of certain large and valuable asphalt deposits in Venezuela; that he believed them to contain more than 2,000,000 tons of crude asphalt, of a good quality for paving purposes, and that to the best of his knowledge and belief a concession could be obtained from the government of Venezuela, and also from the owners of the lands on which said deposits are located, authorizing the mining and exporting of asphalt therefrom on favorable terms, and further recited that 'the said George W. Crichfield, being engaged in the asphalt paving business, is desirous of securing the ownership and control of an asphalt deposit of the magnitude and character described by the party of the second part.'"

In these circumstances, the parties agreed to visit said location. The plaintiff agreed to—

"Use his best endeavor to secure concessions in favor of George W. Crichfield, granting the exclusive right to mine and ship said asphalt on reasonable and equitable terms satisfactory to the said Crichfield."

And the defendant agreed as follows:

"In the event of obtaining of the said concessions in favor of the said Crichfield, and the acceptance of the same by him, the said Crichfield agrees that he will pay in cash, United States currency, unto the said John P. Julia the sum of five thousand dollars ($5,000), and will also guaranty to organize a corporation to handle said deposits, and will issue to said Julia preferred stock therein, guarantied to pay six per cent. dividend, gold, annually, to a par value of one hundred thousand, said stock to be issued within six months after the date of such concession."

The exceptions challenge the action of the court in the admission and exclusion of certain testimony, and in its charge to the jury and in certain refusals to charge, and especially in the refusal of the court to direct a verdict for defendant or for nominal damages only.

The first exception argued is that the court should have directed a verdict for the defendant because the plaintiff never secured such concessions as were called for by the contract. On this point the court charged the jury as follows:

"The defendant has contended here that this third clause should be construed as calling for the procuring of a concession directly from the government to him. I do not so read the contract, and I instruct you that it is not susceptible of such an interpretation, or rather, is not to be confined to such an interpretation. What is contemplated should be obtained was what in ordinary parlance we speak of as a mine. That means a certain part of the

soil, a certain part of the earth's surface, in which there are mineral deposits, and in which a person obtains, not only a full right of ownership so far as the soil is concerned, but also the right to remove the minerals from the soil and to export them and do what he pleases with them. The ownership comes in one way and the right to remove the mineral comes in another way. The right to remove the mineral is called a concession, and so far as the evidence shows, the government did make a concession in regard to this very Inciarte mine; made the concession to Guzman, who, when he sold the title to the mine the title to the real estate in which the mine was located, at the same time sold and conveyed all his right, title and interest in the concession which he had received from the government, and it is under such concession that the mine has been worked. Therefore, however the concession was obtained, whether directly from the government or by transfer from some one who has already obtained the concession from the government to himself, in his own name, was immaterial. The material point is that after inspection of the deposits Crichfield was to be satisfied that they contained the quantity indicated, and that their location was satisfactory, permitting mining and exportation without extraordinary expense, and that it could be shipped on reasonable terms."

This exception is not well taken. All that the plaintiff agreed to do appears from the portions of the agreement quoted above. He was "to use his best endeavor to secure concessions," etc. The vendor of the mine procured a concession from the government giving him the exclusive right to take said asphalt from the mine in question; its title was examined by defendant's attorney and was transferred to the defendant; the transfer was approved by the government, and defendant expressed himself as satisfied with the title and concession. These facts showed a substantial and complete fulfillment of the terms of the contract, and the jury, under appropriate instructions, found in favor of the plaintiff. The trial court, against the exception of defendant, received evidence as to the formation of the company which was organized and took the mine in question, to the effect that said company was organized with a capital stock of $50,000, which was afterwards increased to $1,000,000, of common stock, at a par value of $100 a share; that $300,000 of this stock was left in the treasury, and that $700,000 thereof was issued for the property and various concessions connected therewith; and that there were no other mines and deposits, and that the only property for which the $700,000 was issued was the mine and the railroad concession. It is argued that this evidence was inadmissible, because it did not appear that this company was the one organized by the defendant pursuant to the terms of the agreement, or that he was even an organizer or director of the company, or had any voice in its organization or as to the amount or kind of stock to be issued. The evidence shows that the defendant so far participated in the organization of the company that he turned over the property in question to the company in return for the shares of stock of the company, and thereby furnished, so far as appears, the only property which the company had, and which made it a substantial corporation. In these circumstances, the court was justified in submitting the evidence to the jury, and the jury were justified in their finding thereon, that this was the company organized by the defendant under the agreement.

The other exception to the admission of evidence, that it failed to show that any preferred stock was issued, and that, therefore, the jury were allowed to speculate as to the value of the preferred stock, the issuance of which was provided for by the agreement, may be considered in connection with the exceptions to the refusal of the court to direct the jury that the plaintiff was not entitled to substantial damages, on the ground that the contract was too indefinite and uncertain to warrant a recovery for more than nominal damages and that the proof was insufficient to sustain a finding for substantial damages.

Upon this branch of the case the court charged the jury as follows:

"As a matter of fact, the company was organized and the company did issue stock; and by that same company the Inciarte property was taken on, and the railroad concession was taken, and the property was improved in various ways, in the buildings and fixtures of all kinds, boats and what not. If that company had provided for preferred stock, and had issued it and it had gone upon the market and had been dealt in, of course you would have a very convenient method of ascertaining what that preferred stock was worth. But no preferred stock was provided for in the organization of that company, none was issued, and none ever has been issued; therefore, what you have to do, if you can, is to determine what was, at the time that that preferred stock should have been turned over, its fair and reasonable value if it existed. Even although no preferred stock was issued, if this common stock had been put upon the market, and bought and sold, you might have something very tangible to enable you to reach some sort of an opinion as to what would have been the value of 1,000 shares of preferred stock, superior to the common stock. But there had been no sale, no transaction, no dealings in the stock, so far as we know; and the problem which you have before you is an extremely difficult one, I must concede, and I think you will agree with. One hundred thousand dollars worth of preferred stock does not necessarily mean $100,000. You are business men enough to know that; that there is preferred stock of old and established companies, which have been going on for years and have been making considerable money, that is not worth par. And with regard to new companies, it is within your knowledge that the face value of stock, whether it is common or preferred, does rarely import that that is its real value. All that was promised to the plaintiff was, not $100,000 in money, but 6 per cent. preferred stock of the company, which should be organized to operate this particular property:

"Another way of approaching this subject is to see what property there is. So far as appears, all the property that the company has ever owned consisted of this mine, Inciarte, and the railroad concession, the railroad that it has built, the improvements on the property and the plant that it has made down there, the improvements that it has put in the way of equipment, and so forth. If all that there was to be issued was $100,000 of preferred stock, and you could find out, reasonably and satisfactorily to yourselves as to what the value of all the property of the company was, then perhaps you might be able to make a calculation which would satisfy your own minds that you were making a fair and reasonable appraisement of this $100,000 worth of preferred stock. But, unfortunately for that method of proceeding, this contract does not contain restrictions with regard to that preferred stock which would enable you to adopt that method. It engages that the plaintiff in the event of the carrying out of the contract, should have $100,000 of the preferred stock, but there is no promise or guaranty as to whether the total preferred stock of the company shall be $100,000 or $1,000,000. Moreover, there is no restriction in this contract as to whether or not the company which is to issue the $100,000 of preferred stock to Julia, and to others if necessary, shall not issue bonds. Of course, you as business men are perfectly aware that $100,000 of preferred stock,

when that is the total issue of preferred stock, is worth much more, when it is bottomed on property worth any given amount than if the total issue of preferred stock is $1,000,000. You know perfectly well that if you have a certain property, which is the total property of the company, and you have common and preferred stock out against it, the value of the preferred stock would be one thing if there were no bonds at all outstanding and that the value of the preferred stock would be a different thing if there were bonds; and it is perfectly possible that bonds may be out which are superior to the preferred stock to an amount so large as to reduce the preferred stock practically to nothing at all.

"As I told you before, the burden of proof here is upon the plaintiff, and he must satisfy you on each branch of the case. He is under obligation to furnish you with satisfactory testimony from which you can determine the damages, not as a mere matter of blind guess work, but by a process of reasoning and examination which will enable you to satisfy your minds, as intelligent business men, that you are reaching a fair and proper conclusion upon the evidence. \* \* \*

"All the property that we have any evidence of is that in Venezuela, this mine and railroad concession, and the railroad that was built and the improvements that were made, and the improvements in equipment and plant. The total amount of bonds that were issued is $500,000. It makes no difference in regard to the common stock whether it was issued to a large amount or a small amount, because that would not affect the value of preferred stock. If the preferred stock had been issued, that would be superior to the common stock. If the officers of the company chose to violate the laws of New Jersey by issuing common stock to the value of $700,000 when the property was not really worth $700,000, or was not worth anything at all, that has no bearing on the plaintiff's claim here. The only question here for you is, have you such evidence here that you as intelligent business men can say that, six months after the date of that concession, $100,000 of the preferred stock of that company, if issued to Julia, would have been worth so much money. You must reach such result, not by blind guessing, but by some process of reasoning."

By this fair and accurate statement the court fully presented to the jury the situation, as disclosed by the evidence; the issue between the parties, the evidence upon which the claim for substantial damages was predicated, the difficulties in the way of an ascertainment of actual damage, and, suggesting to them the limitations upon their right to proceed upon unwarranted assumptions as to values, warned them against awarding speculative damages. No exception was taken to the statements as to the evidence, none could have been successfully maintained. The single exception, and the one which, in connection with the exception to the refusal to direct a verdict for nominal damages, properly raises the only substantial question in the case, was taken to the following statement to the jury:

"What you have to do is to consider what was, at the time of the transfer, the value that that preferred stock should have had."

After the entry of the verdict the court entertained a motion for a new trial, and in denying said motion wrote a memorandum, in which it stated the grounds upon which, in its judgment, the jury were justified in their finding of substantial damages. A portion of said memorandum is as follows:

"The only point, therefore, which will now be discussed, is whether, conceding that the jury were properly instructed to find substantial damages upon the testimony, their verdict is excessive. The problem submitted to them was 'what would 1,000 shares of 6 per cent. preferred stock of this

company have been worth on the day the plaintiff was entitled to. receive it?" Defendant contends that no intelligent answer can be given to that question; that it is pure guesswork to name any sum. Incidentally it may be remarked that this contention, if sound, will secure a reversal upon the exceptions to the charge. But in addition it seems to the court that there were sufficient factors proved to warrant an intelligent deduction. Had the preferred stock been issued, it would have ranked below the $500,000 of bonds; but that $500,000 was all put into the property, in building railroads and wharves, putting up houses and plant, buying machinery. boats, etc. Since the asphalt deposit, when developed, turned out to be a valuable one, and the company a going concern, there is no reason to infer that the proceeds of the bonds was lost or seriously depreciated when invested there. On the contrary, the bringing together of all these materials in a place where their use could earn money presumably made their aggregate value higher than the total separate values of the units composing the plant. The jury were fairly warranted in concluding that the improvements put upon the property were of sufficient value to meet the prior lien of the $500,000 bonds. Besides the improvements. there was the original deposit of asphalt. with the concessions which gave the right to mine and export it; and besides the bonds, there was the issue of $700,000 of common stock. One witness testified that the stock was given out as a bonus to purchasers of bonds. The secretary of the company testified that it was issued for the property; i. e., the asphalt deposit and concessions. Whether the issue of common stock was large or small, it would rank below preferred stock. which latter. after the bonds were provided for, would take all the balance of the property up to the extent of preferred stock issued. The evidence showed that in three years 30,000 tons of asphalt were removed, and sold here at $20 to $25 a ton. Of course, there were large sums to be deducted from that selling price for expenses of production, freight, etc.; but it was a perfectly fair inference that there was money in the business, or it would not have been continued for so long. There was evidence, too, from which the jury were warranted in finding that the total deposit was 200,000 tons. Under these circumstances, it is not an unreasonable deduction that the Inciarte mine itself, exclusive of the improvements, was worth not merely the 100,000 bolivars which were paid for it, but at least $100,000 over and above the sum which was spent upon the improvements. Undoubtedly this result is reached largely by inference from facts proven, and may fairly be described as in one sense speculative, but it is not more so than many verdicts which have been sustained; and if it be assumed that there was no error in allowing the jury to figure out substantial damages from the testimony, the. $75.000 they agreed upon was well within the limit which such testimony indicated."

It is claimed that the verdict was speculative, in that it determined what would have been the value of the one thousand shares of 6 per cent. preferred stock agreed to be paid, when no preferred stock was ever issued, when no value was shown for the common stock which was issued, and when the contract failed to provide what amount of preferred stock should be issued, or whether it should be subject to an issue of bonds. Damages are speculative when the probability that a circumstance will exist as an element for compensation becomes conjectural. Anderson's Dictionary of Law. The term "speculative damages" is usually applied in cases of breach of contract where money is sought for loss of uncertain or remote profits not within the understanding of the parties, or where there is uncertainty as to whether the party has been in fact damaged, or whether the damages result from the act of the other party, or where they are wholly uncertain in measure or extent. Anvil Mining Co. v. Humble, 153 U. S. 540, 14 Sup. Ct. 876, 38 L. Ed. 814; 8 American

& English Encyclopœdia of Law (2d Ed.) 609. The rule against the recovery of uncertain damages has been generally directed against uncertainty as to cause rather than uncertainty as to measure or extent; that is, if it is uncertain whether the defendant's act caused any damage, or whether the damage proved flowed from the defendant's act, there may be no recovery of such uncertain damages; whereas uncertainty which affects merely the measure or extent of the injury suffered does not bar a recovery. 8 American & English Encyclopædia of Law (2d Ed.) 611; Taylor v. Bradley, 39 N. Y. 129, 100 Am. Dec. 415; Wakeman v. Wheeler & Wilson Mfg. Co., 101 N. Y. 205, 4 N. E. 264, 54 Am. Rep. 676; Bluegrass Cordage Co. v. Luthy & Co., 98 Ky. 583, 33 S. W. 835. We have frequently had occasion to consider this question in this circuit, and have approved the rule that mere uncertainty as to amount would not preclude recovery in actions to recover compensation for breach of contract to sell or manufacture, or for failure to deliver property which has no recognized market value, and that the party who has wrongfully broken a contract should not be permitted to reap advantage from his own wrong by insisting on proof which, by reason of his breach, is unobtainable. In re Stern, 116 Fed. 604, 54 C. C. A. 60; Allen v. Field, 130 Fed. 641, 65 C. C. A. 19.

This rule is peculiarly applicable to the case at bar. Here, the finding of the jury establishes that the plaintiff fulfilled his contract, the evidence shows that a corporation was formed, that the defendant turned over to it the mine and concessions obtained by plaintiff for which it issued bonds and common stock, that the corporation was working the mine, had received large amounts of asphalt therefrom, and had a large amount still on hand. The evidence justified a finding that the defendant had reaped a substantial benefit from the services rendered by plaintiff under said contract, and had so far complied with his guaranty as to cause a corporation to be organized to handle said property. The sole defense now interposed to the payment of anything except nominal damages is the technical and inequitable one, that as the company was so organized as not to provide for the issuance of any preferred stock, the defendant is relieved from all liability under the contract, because having by his own act deprived the plaintiff of the means of accurately showing what would be the value of such stock, the law will not permit the plaintiff to resort to the best evidence obtainable as to such value, provided such evidence is speculative in the sense of being incomplete or uncertain.

It is argued that, in order to fix the value of the preferred stock which plaintiff was to receive, the contract must have contained a provision defining the amount of preferred stock to be issued, and that, in the absence of a provision as to whether it was or was not to be subject to a bond issue, its value was utterly unascertainable. But we think, in the absence of any words or definition of limitation, that the use of the term "preferred stock," in connection with defendant's guaranty of interest, may fairly be taken to indicate stock whose par value is to be based upon the actual value of the property it represents, and not upon any fictitious or speculative value. If the stock were

so affected by a bonded indebtedness as not to have a substantial value representing a par value it would be a preferred stock merely in name, and would not represent the understanding of the parties as evidenced by the agreement and the defendant's guaranty. It is further argued that the guaranty that the stock would "pay 6 per cent. dividend, gold, annually," in no way formed a basis for establishing its value, because, inter alia, if no dividends were earned, none could be demanded by the owner of the preferred stock, notwithstanding the guaranty. If this be so, it supports the presumption that the preferred stock was to be of substantial value, as suggested above, because if it were not of a substantial value, such as the par value, so that dividends might be earned, the owner of the preferred stock would receive nothing in return for his services. We must assume that the plaintiff would not have agreed to take worthless or nondividend paying preferred stock.

We have examined the cases cited by defendant in support of the proposition that the damages were too uncertain to form the basis of a substantial recovery. Most of them relate to alleged losses of prospective profits in business ventures or to claims asserted where there was no competent evidence of actual damage. Thus in Troy Laundry Machinery Co. v. Dolph, 138 U. S. 617, 11 Sup. Ct. 412, 34 L. Ed. 1083, the damages which the court disapproved were claimed for loss of profits under a stipulation which the court found was only a subordinate and indefinite provision and not involved in the main purpose of the contract. In Watts v. Weston, 62 Fed. 136, 10 C. C. A. 302, there was no evidence as to damages because, while the parties had provided that a price should be mutually agreed upon from month to month, they had failed to make any further agreement as to what said price should be, or to provide any other means for its ascertainment. In City of Memphis v. Brown, 20 Wall. (U. S.) 289, 22 L. Ed. 264, the evidence offered rested upon the mere opinion of witnesses as to value based upon supposed conditions which never existed and were not contemplated by the parties. Reed v. McConnell, 101 N. Y. 270, 4 N. E. 718, was a case of attempt to prove, by opinions of witnesses, damages under a contract for future profits. In The Conqueror, 166 U. S. 110, 17 Sup. Ct. 510, 41 L. Ed. 937, the court sanctioned evidence such as was allowed in this case, by saying that in the absence of market value the value of the use of the property during detention was a proper basis for estimating damages, and that the books of the company showing its earnings at such a time were competent evidence of its probable earnings during the time of its detention. Boston & Albany Railroad Company v. O'Reilly, 158 U. S. 334, 15 Sup. Ct. 830, 39 L. Ed. 1006, was a case where damages were improperly allowed, based on the plaintiff's estimate of what his earnings had been in a business which he had sold out, and on his statement that he intended to resume a new business venture. In Warren v. Stikeman, 84 App. Div. 610, 82 N. Y. Supp. 1003, the plaintiff introduced evidence as to the par value of stock, and rested without proof of any other fact relative to its value. In Barnes v. Brown, 130 N. Y. 372, 29 N. E. 760, the only evidence in the case showed that the stock had no market value, but the court said as follows:

"In the present case no facts of special character relating to damages were alleged, nor were any established by the evidence further than the mere fact that the stock of the company had no market value. If, notwithstanding that fact, the stock may have had an actual value, a different question would have been presented, for the plaintiff could not be subjected to loss, nor could the defendant be permitted to profit by the fact that the stock had no market value at the stipulated time for delivery. Then other means than those afforded by the market would be resorted to under the contract, as within the contemplation of the parties to ascertain the amount requisite to full indemnity to the plaintiff."

The decisions in Griggs v. Day, 158 N. Y. 1, 52 N. E. 692, Laidlaw v. Sage, 158 N. Y. 73, 52 N. E. 679, 44 L. R. A. 216, and Sturgis v. Clough, 1 Wall. (U. S.) 269, 17 L. Ed. 580, have no bearing on the question presented here. We have been unable to find any case which supports the contention of the defendant. The general rule, as stated by the court below, is that the plaintiff is entitled to recover what would have been the market value of such preferred stock, if it had been issued. If there be no market value, then the question is as to what would have been its actual value. The question, therefore, for the jury to determine here was what would have been the real or intrinsic value of this stock, in view of the proved assets of the corporation.

"If the property to be delivered has no market value, its real value is to be ascertained by such elements of value as are attainable." 3 Sutherland on Damages, 1921.

Where no proof is available as to whether stock has market value, intrinsic value, ascertained from value of corporate assets and amount of liabilities, may be taken as the basis for the assessment of damages. Redding v. Godwin, 44 Minn. 355, 46 N. W. 563; Industrial & General Trust, Ltd. v. Tod, 180 N. Y. 215, 232, 73 N. E. 7.

In such a case it is "perfectly competent to resort to other modes of proof to establish its actual value, and this may very properly be done by proof of its dividend earning capacity, the value of the assets of the corporation. * * * In the absence of evidence of actual sales the market value is presumptively the par value." Trust and Savings Co. v. Home Lumber Co., 118 Mo. 447, 24 S. W. 129.

"In the absence of better evidence the market value of all the property of the company may be shown with the view to arriving at the proportionate value of the shares in controversy." Hewitt v. Steele, 118 Mo. 463, 475, 24 S. W. 440, and cases cited; Murray v. Stanton, 99 Mass. 345.

In Dyer v. Rich, 1 Metc. (Mass.) 180, the plaintiff entered into a contract with defendants whereby they agreed that, in consideration of the transfer by him to a certain corporation of a patent owned by plaintiff, they would transfer to plaintiff 10 shares of the capital stock of said company of the par value of $500 each, and that, thereafter, $80,000 should be paid in to the capital stock of the company, making the whole capital $100,000, and that the shares into which the stock was to be divided should not exceed 200, so that each share should be of the par value of $500. The defendants having broken the contract, Chief Justice Shaw stated the rule of damages as follows:

"As to the rule of damages the court are of the opinion that the plaintiff is entitled to recover the value of the 10 shares such as they would have been worth had the full $80,000 cash capital been paid in, in addition to the $20,000 which was the estimated value of the patent. The question for the jury is, what would have been the value of 10 shares in such a capital stock, raised for and appropriated to such a branch of manufacture, had it been made up at the time stipulated and the company ready to proceed in good faith to operate upon such capital pursuant to their charter. It might have been worth somewhat more or less than the par value; so much as it would have been worth in money we think the plaintiff entitled to recover."

Here, the evidence introduced by the plaintiff tended to show what the market value of the property was, for the purpose of showing what would have been the real value of the preferred stock. It was the duty of the defendant, if he claimed that this value was excessive, to introduce evidence in reduction of such value, in accordance with the principle applied in the leading case of Armory v. Delamerie, 1 Strange, 505. There, the plaintiff, being a chimney sweeper's boy, found a jewel, and carried it to the shop of a goldsmith, who, under pretense of weighing it, took out the stones and returned only the socket, and the plaintiff sued in trover. Chief Justice Pratt said:

"As to the value of the jewel, several of the trade were examined to prove what a jewel of the finest water that would fit the socket would be worth; and the chief justice directed the jury that, unless the defendant did produce the jewel, and show it not to be of the finest water, they should presume the strongest against him, and make the value of the best jewels the measure of their damages, which they accordingly did." Redding v. Godwin, supra.

In Murray v. Stanton, 99 Mass. 345, where there was a question as to the value of stolen bonds and it appeared they had no market value, the court held that evidence was admissible to show that they belonged to a set of bonds secured by a mortgage on a road on which a certain section had been graded and which was worth about the amount of said bonds. There, referring to cases where property has no market value, the court said as follows:

"In such cases the real value is to be ascertained from such elements of value as are attainable. The promissory note of an individual may have no market value. But proof of the solvency of the maker, or that the note is secured on real estate, in whole or in part, would require that some value, according to the fair estimate of its probable proceeds, should be put upon it."

In Industrial and General Trust, Ltd., v. Tod, supra, the defendants, who were a committee of bondholders, agreed to submit certain plans of organization to the bondholders, who should enter into said organization. The committee caused the property to be foreclosed, bought it themselves, and tendered to the bondholders stock in another company. Plaintiff thereupon brought an action for damages for breach of contract. There the court said as follows:

"The measure of damages is suggested by what the plaintiff has lost. It has lost its bonds without its fault, in spite of its protest and through the action and negligence of the defendants, as the jury might have found. Those bonds no longer exist as securities, for they are a lien upon nothing and are worth nothing except as vouchers. The bonds, as bonds, are gone, and the plaintiff is entitled to recover the value thereof as of the date when

the agreement was violated by the defendants. Such a recovery would make good the loss, but as the bonds have had no market value for years, how is the loss to be admeasured? The common law will not halt or surrender because the situation is novel, and the ordinary methods of proving values are not available, but will resort to some practical means that will be just to both parties. The bonds were worth something, as was shown by the sale when the defendants made the only bid for the property covered thereby and bought it at the upset price required by the court. These bonds were the first lien upon a going railroad, 119 miles long, with land, depots, rolling stock, wharves, and appurtenances. * * * The value of the bonds was approximately the intrinsic value of the property upon which they were the first lien and the value of the plaintiff's bonds was the proper proportion of that amount, not exceeding in either case the face of the bonds and interest unpaid. Upon proof of the facts, some of which were shown and some excluded by the trial court under objection and exception, showing what kind of a railroad it was, its mileage, grade, curvature and bridges: * * * it was for the jury to estimate the value of the bonded property according to their sound judgment and draw the proper inference as to the proportionate amount that the plaintiff should recover in order to make good the loss it has sustained. It was entitled to its aliquot part of what the road would have sold for, after due allowance for the reasonable expenses of making a sale. The defendants cannot assess the damages which they are to pay, nor pay them in anything but money. This method of establishing the value of property which had no market value has received the sanction of the courts of this and other states"—citing numerous authorities. 3 Sutherland on Damages, 1921.

It is unnecessary to further discuss this question. This review of the authorities shows that the evidence was sufficient to justify the court in submitting the whole question of damages to the jury, and that the jury were justified in awarding substantial damages. Exception was also taken to the reception by the court of certain telegrams tending to show that defendant actually took part in the negotiations and transactions between the plaintiff and the owner of the mine. The proof, however, showed that a motion to produce these telegrams had been served upon the defendant, that they had not been produced, and that the originals had been sent, or authorized, or received by, or shown to the defendant. It is unnecessary, however, to consider the technical question as to whether there was a sufficient basis for the introduction of these copies, because it appeared from other evidence, not objected to, that the defendant did actually take part in the transactions referred to, and said evidence disclosed all that was material on the question at issue, so far as the copies of the telegrams are concerned. Therefore, even if these copies might otherwise have been objected to, it appears from the whole evidence that the defendant suffered no prejudice by their introduction. The exception is therefore overruled.

The judgment is affirmed.