**NEW JERSEY SHIPBUILDING & DREDGING CO. v. LONG BEACH ON THE OCEAN, Inc.**

(District Court, E. D. New York. December 5, 1924.)

**1. Courts ⟨☞⟩371(1).**

Federal court has jurisdiction to foreclose a mechanic's lien, where diversity of citizenship exists.

**2. Contracts ⟨☞⟩322(3).**

Evidence *held* to show that owner, employing dredging company to make fill, did not furnish accurate map for use in figuring yardage, as it was bound by contract to do.

**3. Work and labor ⟨☞⟩14(2) —Owner's failure to furnish dredging company making fill with accurate map held breach of contract, entitling dredging company to recover on quantum meruit.**

Failure of owner to furnish dredging company making fill with accurate map, as required by contract, *held* a breach of contract, entitling dredging company to recover on quantum meruit.

**4. Work and labor ⟨☞⟩14(2) —Furnishing of inaccurate map to be used in calculating yardage of fill, and giving of personal assurances to dredging company, without personal knowledge, held a wanton disregard of dredging company's rights, amounting to fraud.**

Furnishing of inaccurate map to be used in figuring yardage of fill by dredging company, and giving personal assurances, without personal knowledge, *held* such wanton disregard of dredging company's right as to amount to fraud, entitling it to recover on quantum meruit for work done.

**5. Evidence ⟨☞⟩242(1)—Principal and agent ⟨☞⟩131—Owner held bound by engineer's acts and declarations in connection with contract with dredging company.**

Owner, employing engineer in connection with contract with dredging company to make fill, *held* bound by his acts and declarations.

**6. Contracts ⟨☞⟩290—Dredging company's acceptance of "approximate" estimates, without knowledge of inaccuracy, held not to prevent action for additional payment.**

Dredging company's acceptance of "approximate" estimates of yardage in fill, before it became aware that map on which estimates were based was not accurate, *held* not an acceptance, binding dredging company and preventing action by it for additional payment.

**7. Contracts ⟨☞⟩290—Reliance of dredging company, making fill, on inaccurate map furnished by owner, held not to prevent it from recovering on quantum meruit, in view of assurances by owner's president and engineer.**

Dredging company's reliance on map furnished by owner to be used in calculating yardage of fill, and its failure to require measurement by its engineer at stated periods, *held* not to prevent it from recovering on quantum meruit, when map furnished by owner proved inaccurate, in veiw of assurance of owner's president and engineer that it was being treat-

ed fairly, and would receive estimates for all fill it delivered.

**8. Work and labor ⟨☞⟩14(2) —Refusal of owner, on disagreement of its and dredging company's engineers, to join in appointment of third engineer, held breach of contract, entitling dredging company to recover on quantum meruit.**

Refusal of owner to join in appointment of third engineer, after its engineer and engineer of dredging company making fill had disagreed, *held* a breach of contract, entitling dredging company to recover on a quantum meruit.

**9. Work and labor ⟨☞⟩28(4)—Dredging company's right to recover on quantum meruit arising from owner's wrong cannot be defeated by its inability to definitely fix sum due.**

Dredging company's right to recover on quantum meruit for making fill, arising from owner's wrong, cannot be defeated because it cannot definitely fix sum due to it.

**10. Work and labor ⟨☞⟩28(4).**

Evidence *held* to show dredging company entitled to recover for stated yardage in fill in excess of estimates furnished by owner's engineer.

**11. Work and labor ⟨☞⟩9—Dredging company recovering on quantum meruit for work done under contract held entitled to cash payment, rather than payment according to terms of contract breached by owner.**

Dredging company, agreeing that bond and mortgage would be accepted in part payment for making fill, on becoming entitled by reason of owner's breach of contract to recover on quantum meruit, *held* entitled to payment in cash.

At Law. Action by the New Jersey Shipbuilding & Dredging Company against Long Beach on the Ocean, Inc. Decree for plaintiff.

Alexander & Ash, of New York City, for plaintiff.

Alvin C. Cass, of New York City, for defendant.

CAMPBELL, District Judge. This is an action to foreclose a mechanic's lien, in which a personal judgment is asked.

[1] This court has jurisdiction where there is diversity of citizenship. Davis v. Alvord, 94 U. S. 546, 24 L. Ed. 283; Idaho & Oregon Land Co. v. Bradbury, 10 S. Ct. 177, 132 U. S. 509, 33 L. Ed. 433; Sheffield Furnace Co. v. Witherow, 13 S. Ct. 936, 149 U. S. 574, 37 L. Ed. 853; Continental & C. T. & S. Bank v. Corey Bros. Const. Co., 208 F. 976, 126 C. C. A. 64. The lien has been discharged by the giving of security in the form of Liberty Bonds, which are deposited in the registry of this court, the order for the deposit of said bonds providing in part as follows:

"Ordered, that the defendant deposit

with the clerk of this court to the credit of this action the nine bonds, for $10,000 each, as described in said affidavit, as security for the payment of any judgment which may be recovered by the plaintiff in this action. * * *"

The work performed by the plaintiff, for which recovery is sought in this action, consisted of pumping material by a sucker dredge from under the water of what was described as Reynolds Channel, and delivering the same by pipes on certain described lands of the defendant at Long Beach, New York. The method of doing this work was to pump material and water on the specified area, provide a spillway for the escape of the water after it reached a certain height, and allow the material, by reason of its weight, to settle on the area to be filled, until the predetermined grade was reached.

This work was commenced under a contract entered into between the plaintiff, a dredging company, and the defendant, the owner of the land to be filled, dated August 10, 1922. This contract provided generally as follows:

The contractor was to dredge and pump on the fill not less than 2,000,000 yards of material from Reynolds Channel for the sum of 12½ cents per cubic yard, to be deposited according to grades, to be set by owner's engineer. Finished grade to be not less than 4 feet nor more than 12 feet above high water, as designated by stakes to be set by owner's engineer. Engineer of owner to furnish contractor drawings and specifications to which contractor shall conform.

Work to be done to satisfaction of owner's engineer, whose decision as to questions shall be final. Contractor, in case of question, to have right to appoint a civil engineer in good standing, and, if such engineer and owner's engineer do not agree, they shall choose a third engineer, whose decision shall be final. Contractor to furnish facilities for inspection by owner's engineer.

Area to be filled divided into three sections, named, respectively, A, B, and C, which are described by fixed boundaries. Owner's engineer to designate the order in which sections are to be filled. Contractor to keep fill free from rubbish, and spillway to be provided by contractor, and when work is completed pipes are to be removed by contractor without further cost. Contractor to provide for workmen's compensation.

Orders in writing by the credited agent of the engineer appointed by the owner to have same effect as if given by the engineer.

Owner to procure permits. Contractor to start work on arrival of dredge, which was to leave yard on signing contract and to work continuously, unless delayed by uncontrollable conditions, with provisions as to delays. Owner to supply fresh water.

Estimates to be made by owner's engineer on the 1st and 15th days of each month in writing of the amount of work done and the value thereof. If requested by contractor at the termination of every 30 days, contractor's engineer and owner's engineer shall together compile an accurate estimate by means of cross-sectioning the fill. Engineer to use settling boards where there is evidence of yielding ground. Provision as to extra work and as to indemnity.

Payments to be made at the rate of 12½ cents per cubic yard of material delivered, upon presentation of estimates furnished by the owner's engineer of work done under the contract. Twenty-five per cent. of amount due the contractor it agreed to receive in bond and mortgage, which were to be first liens on property at Long Beach, to be selected by the contractor from those owned by the owner, and to be guaranteed by Long Beach on the Ocean, Inc., as to payment, and title policies were to be delivered. Final payment to be made 30 days fom completion of work.

There was attached to the contract a printed copy of what was evidently intended to be a sales map of the area to be filled, with other property, which had been divided into lots, and on which the area to be filled had been generally outlined, and on which appeared, in the handwriting of the defendant's engineer, the words "Temporary Map, to be Replaced by Accurate Map."

The plaintiff commenced work under this contract on September 8, 1922, but did not receive the map prepared by the defendant's engineer, which was claimed to be the accurate map, until October 26, 1922. The accuracy of the estimates of the fill delivered by the plaintiff, which the engineer of the defendant was bound to give to the plaintiff about the 1st and 15th of each month, and on which payment was to be made, depended altogether upon the accuracy of the map which defendant was bound to deliver to the plaintiff, because the method of determining the fill delivered consisted of first making a map showing the area to be filled, dividing the same into cross-sections of 100 feet, finding the elevation of the hard bottom, on which fill was to be placed, at each intersection of the cross-sections, and entering the same on the map, and, as fill was delivered from time

to time, taking the elevation at such intersecting points, the difference between the two elevations furnishing the basis for the determination of the fill delivered over the areas where such differences occurred.

The method adopted of indicating the elevations on the map was to consider the mean low-water line as 100, and, as the elevations were above or below mean low water, to indicate it by figures above or below 100, as the case might be. The same bench marks appear to have been used by the engineers of both parties in the taking of levels, and the same datum for the establishment of mean low water.

The defendant, under the rules of evidence obtaining in our courts, has not proved the map which it delivered to the plaintiff, and upon which measurements were to be made, to be an accurate map. All those participating in the making of the map have not been called to state specifically the part they played in taking the soundings and measurements, and that the same were correctly entered in field books, which were identified, nor does it appear, by the evidence of those who made it, that the map as made correctly showed the soundings and measurements as transcribed in the said field books, nor was said map offered in evidence, except for limited purposes.

The plaintiff, after it had been working for a considerable time, did have soundings taken over a portion of area A, before any fill was delivered on such portion, by Mr. Van Horne, assisted by Mr. Crowley and certain other competent men, who found by actual soundings at certain intersecting cross-section points that the elevation placed on said map at such points, as representing hard bottom, did not truly represent the hard bottom, but that the same was much lower, and I accept their testimony as true.

Neither side has offered any evidence tending to show that distances could not be properly measured by stadia, but plaintiff does contend that the elevations placed on the map at the intersecting cross-section points should have been the result of soundings and levels taken at those points, and not the result of soundings and levels taken at several distances called "shots" and used as a basis for determining the contour.

Judged from the unevenness of the bottom as shown by the soundings taken by Mr. Van Horne, this seems to be true, if plaintiff was to be paid for the material actually pumped and delivered on the area to be filled. East of the 3,800-foot line, but 75 shots were

12 F.(2d)—8

taken in making defendant's map, while 132 soundings at intersecting cross-section points were taken by Mr. Van Horne where apparently no fill had yet been delivered.

Defendant contends that the sounding rod used by Mr. Van Horne and his assistants was not a proper rod, in that, due to the fact that the end of the rod was smaller than the rod, the same would in reality penetrate a hard bottom, and the result obtained would not be a correct one. But with this contention of the defendant I do not agree; on the contrary, I hold that the rod used by Mr. Van Horne was a proper rod.

I agree with the witnesses produced by the defendant that the rod which its engineer claimed to use, called the Philadelphia rod, with a broader surface at the end, might properly be used, but that the result obtained would not be so accurate, and that, when used on this character of soil, unless settling boards are used, an allowance is generally made for settlement.

Defendant's witness Newberg said that in measuring this ground some years before, for the purpose of determining the amount of fill required, he allowed 10 per cent. The question presented in this case is not whether the Philadelphia rod could be used, but did the defendant furnish the plaintiff with an accurate map, as it was bound by its contract to do?

[2] In my opinion it did not, and, further, the president of the defendant and its engineer assured the plaintiff, through its vice president, when he made complaint about the size of the estimates given by defendant's engineer to the plaintiff, that the plaintiff was being fairly treated, and would receive estimates for all fill it delivered, and that it would show in later estimates, and the engineer of the defendant also informed the superintendent of the plaintiff, when making complaints, that the map furnished was an accurate one, and that he, the engineer of the defendant, had cross-sectioned this area every 100 feet and taken his levels to hard bottom, eliminating the need of settling boards. On these representations the plaintiff relied.

[3, 4] The failure of the defendant to furnish an accurate map constituted a breach of the contract on the part of the defendant, and a fraud on the plaintiff, entitling the plaintiff to recover on a quantum meruit. In finding that a fraud was committed on the plaintiff in the furnishing of the map, which was not accurate, I do not find that the president of the defendant or its engineer deliberately set out to perpetrate a fraud on the plain-

tiff, because they undoubtedly relied upon the information furnished them by others; but they had no right to give the assurances which they did to the plaintiff without having personal knowledge that they were true, and the furnishing of such map and the giving of their personal assurances constituted such a wanton disregard of the plaintiff's rights as to amount to fraud, because the effect of the furnishing by the plaintiff of the material to be measured and paid for on the basis of an inaccurate map was to obtain from it services for the benefit of defendant for which plaintiff would not be paid. A. B. Young Const. Co. v. Road Improvement Dist. No. 2 (C. C. A.) 297 F. 127, at page 137; Chicago, Santa Fé & C. Railroad v. Price, 11 S. Ct. 290, 138 U. S. 185, 34 L. Ed. 917.

[5] The engineer of the defendant was its agent, and it was bound by his acts and declarations. Wright v. Reusens, 31 N. E. 215, 133 N. Y. 298; Smith v. Finkelstein, 147 N. Y. S. 324, 162 App. Div. 128. By the express terms of the contract the engineer of the defendant was bound to use settling boards where there was yielding ground

[6] The estimates delivered by the engineer of the defendant to the plaintiff were each and all of them marked "approximate" and were intended to be so considered, and the receipt) of payment by the plaintiff of the amount at the contract price for the number of cubic yards, estimated before it became aware that the map was not accurate, was not such an acceptance under the terms of the contract as to bind the plaintiff and prevent recovery in the action at bar.

[7] The reliance of the plaintiff on the map furnished by the defendant, and the failure to require a measurement by its engineer at the end of each thirty-day period, did not, in the face of the assurance of the President and engineer of the defendant on which it relied, prevent the plaintiff from recovering on a quantum meruit on the facts shown in the case at bar.

[8] When the plaintiff, by its engineer, Van Horne, disagreed with the defendant's engineer, and requested the appointment of a third engineer, as provided by the contract, the refusal of the defendant to join in the appointment of a third engineer constituted a breach of the contract, and the plaintiff became entitled to recover on a quantum meruit. Stephens v. Phœnix Bridge Co., 139 F. 248, 71 C. C. A. 374; Wright v. Reusens, supra; Jones v. Judd, 4 N. Y. 412; Heine v. Meyer, 61 N. Y. 171; Borup v. Von Kokeritz, 147 N. Y. S. 832, 162 App. Div. 394.

[9] The plaintiff, thus being entitled to re-

cover on a quantum meruit, because of the defendant's wrong, cannot be prevented from recovering, because it cannot definitely fix the sum due to it from the defendant, but may offer the best evidence it can to fix such sum. Lincoln v. Orthwein, 120 F. 880, 57 C. C. A. 540; Allen v. Field, 130 F. 641, 65 C. C. A. 19; Shields v. Norton, 143 F. 802, 74 C. C. A. 254; Crichfield v. Julia, 147 F. 65, 77 C. C. A. 297.

[10] From the evidence offered by the plaintiff, two methods of determining the amount due it are presented, one by a comparison of the elevations of solid bottom found by plaintiff's engineer, Van Horne, with the map furnished by the defendant, on which its estimates are based, and by averaging determining the amount furnished on the whole area A, in addition to the amount shown on the map on which the estimates given by the defendant's engineer are based; the other a theoretical estimate of the amount delivered, which, if no better evidence had been offered by plaintiff, would furnish a basis for approximately determining the amount of fill delivered.

But there was no evidence offered that any such method of estimating had ever been used on any such undertaking, and while there was expert testimony offered that by that method the fill delivered could be determined with a fair degree of certainty, yet each witness insisted on certain conditions which must exist, and the expert who prepared the estimate had to depend on others for the information as to those conditions.

Given an adequate supply of water, the capacity of the pump, the hours of pumping, and the fact that the pump worked to full capacity during that time, a fairly accurate estimate of the amount of water pumped could be formed. But in my opinion the amount of material sucked up with water by a pump, under the conditions prevailing on this job, cannot be determined with anything like the same degree of accuracy, because the conditions are not uniform, even with the same material, as the depth from which the material is taken, whether it is loose or hard, and a number of other elements, go to prevent uniformity, and even on the undertaking in question the plaintiff had a cutter for a time, which changed the conditions, and some of the material pumped by the plaintiff escaped when the spillway was broken through.

Mr. Van Horne took soundings and fixed the elevation of the hard bottom on many of the east stations of stations 38 to 50 both inclusive. In some instances, however, he was unable to fix the elevation of the original bot-

tom, because the fill had been made at that point, and in others it appears that fill had been delivered in some quantity before Mr. Van Horne had made his soundings. All of these stations I have eliminated in my calculation.

I have compared the elevation of the hard bottom as found by Mr. Van Horne, the plaintiff's engineer, and shown on Plaintiff's Exhibit No. 9, with the elevation of the hard bottom as shown on Defendant's Exhibit P, the map made by defendant's engineer, on which the estimates were based at 132 cross-section points, being the following: Station 3800, east stations 3, 4, 5, 6, and 7; station 3900, east stations 2, 3, 4, 5, 6, 7, and 8; station 4000, east stations 2, 3, 4, 5, 6, 7, 8, 9, 10, and 11; station 4100, east stations 2, 3, 4, 5, 6, 7, 8, 9, and 10; station 4200, east stations 1, 2, 3, 4, 5, 6, 7, 8, 9, 11, 12, and 13; station 4300, east stations 1, 2, 3, 4, 5, 6, 7, 8, 9, 10, 11, 12, 13, and 14; station 4400, east stations 1, 2, 3, 4, 5, 6, 7, 8, 9, 10, 11, 12, 13, and 14; station 4500, east stations 1, 2, 3, 4, 5, 6, 7, 8, 9, 10, 11, and 12; station 4600, east stations 1, 2, 3, 4, 5, 6, 7, 8, 9, 10, and 11; station 4700, east stations 1, 2, 3, 4, 5, 6, 7, 8, 9, 10, and 12; station 4800, east stations 1, 2, 3, 4, 5, 6, 7, and 8; station 4900, east stations 1, 2, 3, 4, 5, 6, 7, 8, 9, and 10; station 5000, east stations 1, 2, 3, 4, 5, 6, 7, 8, and 9.

Stations 4200 east 10 and 4700 east 11 are omitted because in one instance no elevation was given for the bottom on Defendant's Exhibit P and in the other no elevation for the bottom is given on Plaintiff's Exhibit No. 9. The 132 stations furnished a good basis for an average, and while, of course, the computation I am making is to some degree arbitrary in my averaging as to the whole area, no fairer method can be found, and defendant has no just cause to complain, because it could have avoided the necessity of this computation by forwarding an accurate map to the plaintiff, on which the fill delivered could have been computed.

From this comparison it appears that the average depth of the hard bottom as found by the plaintiff's engineer, Mr. Van Horne, at those points was 959/1000 of a foot lower than as indicated on the map furnished by the defendant to the plaintiff on which the estimates were based. About two-thirds of the area A to be filled was covered by water, a land-locked lake, and the bottom on which the fill was to be placed was much of it soft mud. The other one-third of the area A was above the level of the lake, but below the level of the street, and some of it was covered by mud, which from being exposed to the sun and air had formed a hard crust.

In the course of pumping the material and water on the area to be filled, the lake had been increased in size and depth, and much of the mud had been softened. At places there was vegetable matter, grass roots, but no mattress had been formed.

Plaintiff contends that substantially all of the mud was washed out during the progress of the work, the same being pushed ahead by the heavy sand and forming mud waves, which went out through the spillway. Defendant contends that but little of the mud went out, and points to the test pits and borings as showing that the mud remained in the fill, and that the level at which it and grass roots were found in the pits and borings proves the accuracy of the map furnished by it on which the estimates were based.

Neither contention is entirely correct. All of the mud was not washed out, as was shown by the test pits and borings, but the mud and grass roots so found had been moved, and they did not show the level of the hard bottom before the fill, because the heavy sand, when delivered on the fill, in many instances, went under the mud and grass, and such mud and grass roots as remained in the fill, in many instances, apparently had been moved to another position.

I am therefore of the opinion that the hard bottom of the area A which was filled can be determined with reasonable certainty to have been on the average over the whole bottom 7/10 of a foot lower than was shown on the map furnished by the defendant to the plaintiff, as a basis for the estimates to be furnished, and that, as there were 6,636,000 square feet in the area A to be filled, the quantity of fill delivered by the plaintiff was 172,044 cubic yards in excess of what was shown on said map.

The testimony of the witness Newberg as to his measurements in 1918 does not, in my opinion, contradict this finding. Defendant offered in evidence what it called a final estimate, but there is no provision in the contract for any final estimate, and, as all the prior estimates were approximate, I have considered the so-called final estimate as what it really is, a computation of the quantity of the fill delivered according to the map furnished by the defendant to the plaintiff, on which the estimates were based, and even by the testimony of the plaintiff's witness, Mr. Van Horne, it appears that the total sum of the 19 estimates is in excess of the quan-

tity of fill delivered, which would be shown by using the said map as the basis of computation, as one of the estimates was, so far as he could observe, for 50,000 cubic yards more of material than was shown by figuring on the basis of the said map furnished by the defendant to the plaintiff.

I find that the plaintiff pumped and delivered from Reynolds Channel, upon the lands of the defendant at Long Beach, N. Y., in the improvement of said lands, fill in the quantity hereinafter set forth, and that the fair and reasonable value of said material was 12½ cents per cubic yard. The following is a statement of the quantity delivered, the value thereof, the amount paid on account, and the balance due:

1,555,109 cubic yards of material pumped on area A, as shown on the map on which the estimates were based at 12½ cents .............. $194,388.62

172,044 cubic yards of material pumped on area A, for which credit was not given by engineer, because of the errors in the elevation of the hard bottom shown on said map, at 12½ cents.... 21,505.50

136,600 cubic yards of material pumped on area B, at 12½ cents .......... 17,075.00

10,000 cubic yards of material allowed in two forms to carry pipe line, at 12½ cents .............. 1,250.00

1,000 cubic yards of material allowed for back fill behind houses at beach near station, at 12½ cents .............. 125.00

1,874,753                              $234,344.12

Defendant has paid on account:
In cash ..............$154,279.83
In mortgages ......... 35,693.65  189,973.48
Balance due to plaintiff ........$44,370.64

[11] The defendant has not questioned the notice of lien filed by the plaintiff, and I find that the plaintiff acquired a good and valid lien, under the Lien Law of the state of New York, upon the premises described in the said notice of lien, and that by reason thereof, and also by reason of the terms of said order discharging said lien, the plaintiff is entitled to a personal judgment against the defendant, and to have the Liberty Bonds paid into the registry of this court pursuant to said order sold and the proceeds applied to the payment of the judgment to be entered hereon, and that, if the proceeds of the sale of said bonds be insufficient to satisfy the said judgment, the plaintiff is entitled to

recover the balance from the defendant. That by reason of the breach of the contract aforesaid by the defendant, the plaintiff is entitled to a decree for the payment of the whole amount in cash.

A decree may be entered in favor of the plaintiff against the defendant as aforesaid for the sum of $44,370.64, with interest thereon from the 23d day of June, 1923.