**ARONSON et al. v. K. ARAKELIAN, Inc.**

No. 8927.

Circuit Court of Appeals, Seventh Circuit.

Feb. 25, 1946.

232

George E. Q. Johnson, Walter E. Wiles, and William L. Howard, all of Chicago, Ill. (Herman Barrington, of Chicago, Ill., of counsel), for appellants.

Elmer Gertz and Allen H. Schultz, both of Chicago, Ill., for appellee.

Before SPARKS, MAJOR, and KERNER, Circuit Judges.

KERNER, Circuit Judge.

Plaintiffs sued defendant, K. Arakelian, Inc., for breach of contract. Defendant's answer was in the nature of a motion to strike and a motion for summary judgment. The court sustained the motion and entered a judgment for costs against plaintiffs. To reverse, plaintiffs appeal.

Plaintiffs' amended complaint alleged that in June, 1943, plaintiffs offered to sell to defendant, at 50 cents a gross, ten million gross of used bottle caps and that defendant, on June 30, 1943, wrote plaintiffs a letter [1] in which it agreed to purchase the caps, the sale to be consummated only if it was not in violation of any orders of the War Production Board (hereinafter referred to as WPB); that no authorization to Ferdinand Gutmann to reline the caps was necessary for investigation had shown there was no limitation upon a manufacturer's right to reline caps; that plaintiffs appeared before WPB and asked for a modi-

---

[1] "Chicago, Illinois,
June 30th, 1943

Associated Supply Company
180 W. Washington Street
Chicago, Illinois.
Atten: Mr. Richard B. Greenwald
Gentlemen:

We are willing to purchase from you approximately ten million gross of reconditioned and deoxidized bottle caps, which are in a condition to be relined by Ferdinand Gutmann of Brooklyn, New York, at the price of fifty cents per gross, provided that you furnish us with an author-ization from the War Production Board permitting us to purchase these caps from you, and also an authorization from the War Production Board permitting Ferdinand Gutmann to reline these caps for us.

These authorizations must be obtained within sixty days from the date of this letter, and delivery of the entire order must be completed within six months after the War Production Board grants the authorizations set out above.

Yours very truly,
Madera Wineries and Distillers
By V. G. Nishkian."

fication of conservation order M-104, as amended May 17, 1943 (8 Fed.Reg. 6596); that the order was modified in an amendment to be released on August 9, 1943 (8 Fed.Reg.11237); that under the provisions of the order defendant was not limited from purchasing and plaintiffs were not limited from selling ten million gross of used bottle caps; that plaintiffs presented defendant with a photostatic copy of the amended order and that thereupon defendant stated it was satisfied with the amended order, but requested a delay in the execution of the terms of the contract until actual promulgation of the order; that the condition precedent regarding the WPB authorization to defendant was satisfied by defendant's approval of order M-104 as amended August 9, 1943, and thereby a valid and existing contract came into existence.

The complaint further alleged that following the promulgation of amended order M-104 on August 9, 1943, a conference was had with defendant in regard to shipping instructions, at which terms of payment were specified by defendant and accepted by plaintiffs; that thereafter a delivery of 600 gross of bottle caps was made to defendant's Chicago office and that two additional shipments were made; one to replace the first shipment which defendant claimed had been lost and the other to the Wellington Closure Company, which firm was to reline the caps instead of Ferdinand Gutmann.

The trial judge was of the view that "there is no genuine issue herein as to any material fact. None of the material facts necessary to a determination of this cause are in dispute," and he concluded as a matter of law that "no valid or enforceable contract of any kind is shown to have come into existence between the parties."

Our problem is to ascertain whether the complaint averred a binding contract under the provisions of the existing WPB regulation. The answer depends upon the interpretation which may reasonably be given to the offer to sell and its acceptance by defendant and the action thereafter of the WPB.

In defendant's letter offering to purchase the bottle caps there are certain conditions laid down which must be satisfied before a legal and binding contract is to take effect. Plaintiffs contend that the complaint alleges full compliance with the condition precedent, and in support thereof they point to the normal mode of WPB authorization and to the approval by defendant of the copy of the then-to-be amended order M-104. The order when released on August 9, established a quota for wines,[2] which had not existed previously. Defendant denies compliance and contends that plaintiffs were required to give defendant specific authorization from WPB.

Under a reasonable construction of the offer to purchase, were specific authorizations from the WPB necessary and contemplated? Concededly a party may impose such conditions as he desires; nevertheless, a contract will not be presumed to have imposed an absurd or impossible condition on one of the parties, but will be interpreted as the parties must be supposed to have understood the conditions at the time, 6 R.C.L. p. 904, § 289. The intention of the parties as manifested in the language of an instrument and the subject matter in reference to which the parties are contracting must control. Weger v. Robinson Nash Motor Co., 340 Ill. 81, 172 N.E. 7; New York Casualty Co. v. Sinclair Refining Co., 10 Cir., 108 F.2d 65, 69; A. Leschen & Sons Rope Co. v. Mayflower Gold Mining Co., 8 Cir., 173 F. 855, 35 L.R.A.,N.S., 1. Here the language of the offer to purchase was: "provided that you furnish us with authorization from the WPB." A literal interpretation of the words does not produce a request for specific written authorization. It would seem that the request here is primarily for WPB sanction, and whether the procedure desired was to be specific authorization or a mere affirmative WPB order appears inconsequential. But if application of the test to language is inadequate, an even more exhaustive rule is set out in Wolf v. Schwill, 289 Ill. 190, 192, 124 N.E. 389, 390: "where the language of a contract is susceptible of more than one construction,

---

[2] Schedule IV—Beverage Closures
Product: Wines and distilled spirits
Quota: During balance of 1943—25% of the number used in 1942. For any subsequent year, 50% of the number of closures used in 1942.

(e) No person packing wines and distilled spirits shall at any time, accept or have any supplies set aside for him, any quantity of closures which will increase his inventory to more than a 60-day supply.

\* \* \* it is to be construed in the light of the circumstances surrounding the parties, the nature and situation of the subject-matter, and the apparent purpose of making the contract."

Whether a request for specific written authorization can be gleaned from the setting of the subject matter, surrounding circumstances, and apparent purpose is, we think, denied by the mould into which these separate considerations are cast. The purpose of the Second War Powers Act, 50 U.S.C.A.Appendix, § 633, was promulgated in the interest of national security and for the defense of the nation. It provides that the President may allocate any materials where a shortage is threatened. He may exercise any power and authority conferred on him through such agency as he may choose and subject it to the rules he may prescribe. With this as his authority the President established the War Production Board and conferred upon it the authority and powers vested in him by Congress. The WPB's orders are published in the Federal Register and authorization, or the lack of it, is to be found by a business man in the order applicable to the materials he uses. Shreveport Engraving Co., Inc., v. United States, 5 Cir., 143 F.2d 222, 225. If a material is not mentioned in the terms of a pertinent WPB order, then it follows that its use is not restricted by that order. It is unnecessary to send permits directly to individual members of industry, for written affirmative permits would tend to snarl the Government's utilitarian policy of restrictive use of vital materials. It follows, therefore, that the subject matter and surrounding circumstances involved here obviates the necessity of specific written authorization from the WPB to the defendant.

Further, and even more convincing, there is defendant's act approving M-104 as a satisfactory authorization from the WPB. This is subject to proof, but the agent who signed the principal's letter making the offer and then acquiesced in plaintiffs' conformance has bound his principal. New Jersey Shipbuilding & Dredging Co. v. Long Beach on the Ocean, D.C., 12 F.2d 111.

Defendant's letter also requested authorization from the WPB permitting Gutmann to reline the caps. Plaintiffs allege a negative authorization in that M-104 does not forbid relining bottle caps; therefore, such an act must be permitted. As in the previous consideration of the purpose of the Second War Powers Act, such a conclusion is inevitable, because under the Act the resultant orders and directives were designed in an emergency and equipped to counteract threatened shortages of critical materials. To have saddled the WPB with the task of affirming individual citizen's contracts would be to throttle instead of facilitating the war effort. Defendant expressed satisfaction with M-104, as amended, and such satisfaction must be construed to extend to the work to be done by Gutmann, because the caps sent to Gutmann were to remain in the ownership of defendant and the WPB's approval of any work to be done upon the caps is satisfactory if the approval is conveyed to and endorsed by defendant.

Moreover, as we have noted, other prerequisites necessary to the existence of a contract, acceptance of the offer and consideration, are alleged in the amended complaint. These allude to defendant's subsequent conduct which appears to acknowledge the existence of the contract. A summary judgment is proper only when there is no genuine issue as to any material fact. Rule 56(c), Federal Rules of Civil Procedure, 28 U.S.C.A. following § 723c. It follows that the amended complaint sufficiently raised the issue of the existence of a contract, which plaintiff was entitled to have tried in the ordinary manner as an issue of fact.

The ultimate question to be determined, however, is whether M-104 permits the sale of ten million gross of bottle caps. Order M-104, as amended August 9, 1943, establishes a quota for wines and distilled spirits. Defendant in support of the illegality of a purchase of ten million closures contends that under the quota terms of M-104, it was authorized to use no more than 25,180 gross during the balance of 1943 and no more than 50,361 gross during the entire year of 1944.

Such figures, while not proven, are fantastically finite when compared to the offer to purchase ten million closures. When considered with the further restriction on firms packaging wines to a 60-day supply of caps, they seem well-nigh conclusive. On the other hand, there is nothing in M-104 which subjects jobbers pur-

chasing for resale to quota restrictions.[3] In essence, while jobbers must conform to the provisions of the order, they cannot be held to a quota because quotas are based on prior use. Any other interpretation of the order would eliminate the function of the jobber. A contract will receive that construction which would render performance under it legal, rather than one which would render performance illegal. In re Gillham's Estate, 286 Ill.App. 370, 3 N.E.2d 524; Federated Textiles, Inc., v. Glamour Girl, Inc., 265 App.Div. 252, 38 N.Y.S.2d 493; Lubbock Hotel Company v. Guaranty Bank & Trust Co., 5 Cir., 77 F.2d 152.

The language of the offer from defendant was "to purchase" and nothing was said regarding the use defendant intended for the closures. Under a reasonable interpretation of the staggering offer to purchase ten million gross closures, it is fair to assume that defendant must have intended to use the closures for other purposes than bottling wine. If its figure of 100,722 gross, the number of closures it claims to have used in 1942, is accepted, defendant was seeking to buy one hundred times its normal supply. Excluding even the limitation on use created by a quota, defendant was seeking to buy an abnormal supply. Obviously, defendant intended to resell some of the closures. Under M-104 this was possible, provided that defendant observed the restriction not to have on hand or set aside more than a 60-day supply. It appears that the 60-day maximum supply of closures applies to closures for packaging wines, and a company engaged in bottling wine like defendant might purchase closures for resale the same as any jobber. The restriction must allude only to the inventory of closures used to bottle wine, because, as stated, under the order

jobbers purchasing for resale do not have quota restrictions. Purchasers such as jobbers are required only to conform to the provisions of the WPB order. An examination of the several schedules regarding quotas in M-104 shows that innumerable products have unlimited packing quotas,[4] and defendant, therefore, with ten million gross closures could observe the provisions of the order and resell to any number of industries. It would be possible for defendant to resell to other wine companies, provided that they observed their quotas. To do this, however, the order requires that the vendor obtain from the purchaser a certificate to the effect that he, the purchaser, is familiar with the terms and that he will not violate the order in the use of the closures. 8 Fed.Reg.11239.

A purchaser's certificate, as described above, should have been given by defendant to the plaintiffs. It was not. Was the absence of such a certificate fatal to plaintiffs' allegations of legality in that plaintiffs' failure to secure the certificate was contrary to public policy? We think not. It is clear from defendant's letter of June 30, 1943, that it had no intention of violating WPB orders, and it is alleged that defendant was familiar with M-104 which is the purpose of securing a purchaser's certificate. Failure to require the purchaser's certificate does not necessarily make a contract unenforceable as against public policy. Canister Co. v. National Can Corp., D.C., 63 F.Supp. 361. Under the circumstances appearing herein, there was no violation of public policy.

The judgment of the District Court is reversed and the cause is remanded for further proceedings.

It is so ordered.

---

[3] 8 Fed.Reg. p. 11238

(c) Restrictions upon purchase, acceptance of delivery, and use of closures. No person shall, during any calendar year (or seasonal year or other period, when specified) purchase, accept delivery of, or use for packing a product, any closure made in whole or in part of tinplate, terneplate, or blackplate, except as, and to the extent permitted in Schedules I, II, III, and IV

attached to this order: Provided, however, That a jobber or retailer may obtain and sell closures in conformity with the provision of this order.

[4] Vegetables and vegetable products, fruits and fruit products, meats and meat products, milk and dairy products abound in unlimited quotas. Others are only slightly restricted in that their quotas are 100% of 1942.